ZIGAN SAND AND GRAVEL, INC., Appellant/Cross–Appellee,

v.

CACHE LA POUDRE WATER USERS ASSOCIATION; South Adams County Water and Sanitation District; Central Colorado Water Conservancy District and the Ground Water Management Subdistrict of the Central Colorado Water Conservancy District; St. Vrain and Left Hand Water Conservancy District; Water Users Association of District No. 6; Jeris A. Danielson, State Engineer; and Alan Berryman, Division Engineer, Water Division No. 1, Appellees/Cross–Appellants,

City and County of Denver, acting by and through its Board of Water Commissioners, Appellees/Cross–Appellees.

No. 86SA213.

Supreme Court of Colorado, En Banc.

May 23, 1988.

---

Hill & Robbins, P.C., David W. Robbins, Dennis M. Montgomery, Denver, for appellant/cross-appellee.

Fischer, Brown, Huddleson & Gunn, William H. Brown, Fort Collins, for appellee/cross-appellant Cache La Poudre Water Users Assn.

Moses, Wittemyer, Harrison and Woodruff, P.C., David M. Brown, Boulder, for appellee/cross-appellant South Adams County Water and Sanitation Dist.

Kim R. Lawrence, Greeley, for appellee/cross-appellant Cent. Colorado Water Conservancy Dist. and The Ground Water Management Subdistrict of the Cent. Colorado Water Conservancy Dist.

Grant, Bernard & Lyons, Jeffrey J. Kahn, Wallace H. Grant, Longmont, for appellees/cross-appellants Water Users Ass'n of Dist. No. 6 and St. Vrain and Left Hand Water Conservancy Dist.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Sherry Caloia, Peggy M. Ventura, Barry Stein, Asst. Attys. Gen., Natural Resources Section, Denver, for appellees/cross-appellants Jeris A. Danielson, State Engineer, and Alan Berryman, Div. Engineer.

Wayne D. Williams, Michael L. Walker, Henry C. Teigen, Anne R. Avery, Casey S. Funk, Mary B. Moore, Denver, for appellees/cross-appellees.

John M. Sayre, Gregory J. Hobbs, Jr., Zach C. Miller, Bennett W. Raley, Denver, for amicus curiae Northern Colorado Water Conservancy Dist.

Kelly, Stansfield & O'Donnell, Timothy J. Flanagan, Denver, for amicus curiae Colorado Rock Products Assn.

Fairfield & Woods, P.C., Howard Holme, Kevin B. Pratt, Stephen H. Leonhardt, Denver, for amicus curiae Southeastern Colorado Water Conservancy Dist.

Gorsuch, Kirgis, Campbell, Walker and Grover, Charles E. Grover, Joseph B. Wilson, Denver, for amicus curiae Colorado Contractors Ass'n, Inc.

Clanahan, Tanner, Downing & Knowlton, John P. Akolt, III, Nancy Catherine Shea,

Denver, for amicus curiae Farmers Reservoir and Irr. Co.

LOHR, Justice.

This is an appeal from a judgment of the District Court for Water Division No. 1 denying the application of Zigan Sand and Gravel, Inc. (Zigan) for approval of a plan for augmentation. Zigan proposed to mine sand and gravel from its land near the South Platte River in Adams County. The operation would result in two open pits that would extend below the water table and intercept ground water. The ponds so created would continue in existence after completion of mining and would have a total surface area of approximately 69 acres. The court disapproved the plan for augmentation because it contained no provision for replacement of the water that would be lost by evaporation from the surface of the ponds after completion of the mining activities. Zigan appealed, and certain parties who had objected to Zigan's plan for augmentation cross-appealed the court's holding that Zigan had no obligation to replace water lost through evaporation during the mining operations and prior to commencement of the reclamation process. We affirm the district court's denial of Zigan's application for approval of the plan for augmentation, but reverse the court's determination that augmentation is not required for evaporation that will occur before reclamation has begun.

## I.

Zigan is engaged in the business of mining and processing sand and gravel. In 1980 it applied to the Mined Land Reclamation Board for a permit to mine sand and gravel from a site in Adams County pursuant to the procedure prescribed by the Colorado Mined Land Reclamation Act, sections 34–32–101 to –126, 14 C.R.S. (1984 & 1987 Supp.) (Mined Land Reclamation Act). In 1982 it filed a second application relating to an adjacent site. The proposed mining operations involve excavation of sand and gravel from two open pits extending below the water table in the alluvium of the South Platte River. Each application included a reclamation plan as required by the Mined Land Reclamation Act,[1] § 34–32–112(1)(b), (3), 14 C.R.S. (1984), and each plan proposed the creation of a pond and revegetation of the disturbed area to reclaim the mined land. In its applications, Zigan stated that the proposed future land use was "Homesites and open area" with respect to pit no. 1 and "Home sites & wildlife habitat" with respect to pit no. 2. Zigan obtained the required permits and commenced mining operations.

In 1982, after mining operations had begun, the division engineer issued a cease and desist order, and the state and division engineers sought an injunction against Zigan in District Court for Water Division No. 1 to prohibit diversions of water that would cause injury to senior water users. See § 37–92–502, 15 C.R.S. (1973). An injunction was issued, and rather than appeal, Zigan elected to seek approval of a plan for augmentation.

Zigan also elected to apply to the state engineer for well permits for the two gravel pits.[2] See § 37–90–137, 15 C.R.S. (1973).[3] The state engineer denied each of these applications by separate orders dated November 29, 1982, and June 21, 1983. In doing so, the state engineer specifically

---

1. "Reclamation" is defined in section 34–32–103(13), 14 C.R.S. (1984), of the Mined Land Reclamation Act as:

    the employment during and after a mining operation of procedures reasonably designed to minimize as much as practicable the disruption from the mining operation and to provide for the rehabilitation of affected land through the rehabilitation of plant cover, soil stability, water resources, or other measures appropriate to the subsequent beneficial use of such mined and reclaimed land.

2. Although it may logically be inferred that the injunction against diversions precipitated the filing of the well permit applications, the record contains no information concerning the details of the injunction proceedings or the date of the injunction, and we learn of the injunction only through summary references in the briefs.

3. References in this opinion to §§ 37–90–137 and 37–92–502 are to the versions of these statutes in effect at the time this action arose. Both provisions have been subsequently amended in respects not relevant to the present case.

found that the water that would be diverted is hydraulically connected to the South Platte River, the South Platte River is over-appropriated at some or all times of the year, the proposed diversions would cause depletion to the river at times when the river is over-appropriated, and diversion at such times would cause material injury to the vested water rights of others. As a result, the state engineer specifically stated in each order of denial that he was "unable to find that there is unappropriated water available for withdrawal by the proposed well and that the vested water rights of others will not be materially injured." *See* § 37–90–137.

Shortly before the denial of the first well permit, Zigan filed its application for approval of a plan for augmentation in the District Court for Water Division No. 1. As subsequently amended, the application sought to augment pit no. 1 and pit no. 2 with water to be supplied by exercise of specified water rights to replace the losses caused by hauling away moisture in the sand and gravel mined from the pits and the losses caused by use of water for dust suppression. The plan made no provision for replacement of evaporative losses from the surface of the ponds to be created by the mining activity. A number of objectors filed statements of opposition to the proposed plan for augmentation.[4] The principal objection advanced by those in opposition to the plan was the absence of provisions for the replacement of water to be lost due to evaporation from the surface of the ponds.

The parties were able to agree on an extensive stipulation of facts, which was attached to the pretrial order. The parties agreed that Zigan is mining sand and gravel from two pits (pits nos. 1 and 2) on lands owned by its president, Theodore Zigan, and located in the alluvium of the South Platte River in Adams County. The pits extend below the surface of the underground water.[5] Upon completion of the mining operations, approximately 69 acres of water surface will be exposed to the atmosphere. Evaporation from this water surface will average 2.58 acre feet of water per acre each year, resulting in the annual evaporation of 178 acre feet of water. This evaporation will deplete the flow of the South Platte River. Absent the mining of the sand and gravel, none of this evaporation would occur.

The mining of the sand and gravel also results in some water being transported off the property when the wet sand and gravel is removed. This water does not return to any natural stream in Colorado. Over the course of mining operations, the parties estimate that 141.6 acre feet of water will be lost in this manner, and the annual loss will average 23.29 acre feet. Zigan stipulated that this water must be replaced in a plan for augmentation.

The stipulation further provided that a water supply pit had been dug by Zigan near its mining operations and was being used to provide water for dust suppression and sand and gravel washing. Another such pit had been dug earlier to obtain water for these same beneficial uses, but this pit had been backfilled, eliminating further evaporation. The water obtained from each of these two supply pits is ground water tributary to the South Platte River. The parties have stipulated that such supply pits are wells, and that the evaporation losses from the use of water from these wells must be replaced under a plan for augmentation. The pit presently in use will be backfilled when the mining operations cease, and thenceforth no water will be lost to evaporation through that pit. Zigan stipulated that water is used for dust control purposes from May 1 to November

4. The objectors included the Cache La Poudre Water Users Association, the Central Colorado Water Conservancy District and The Ground Water Management Subdistrict of the Central Colorado Water Conservancy District, St. Vrain and Left Hand Water Conservancy District, South Adams County Water and Sanitation District, the Water Users Association of District No. 6, and the City and County of Denver. These water users and their members own vested or conditional water rights on the South Platte River.

5. Zigan Sand and Gravel utilizes a wet dredging mining process. The pits will not be "dewatered" during mining.

1 of each year. This water is totally consumed, and the consumptive use is approximately 5.5 acre feet per year. After the mining of sand and gravel is completed, no further water will be used for dust control purposes.

The stipulation also stated that the evaporation of water from pits nos. 1 and 2 and the supply pits will deplete the flow of the South Platte River. The South Platte River is over-appropriated, so at certain times of the year, the water supply is insufficient to satisfy all of the decreed water rights on the river. Therefore, out-of-priority diversions from pits nos. 1 and 2 and from the water supply pits may cause injury to the vested water rights or decreed conditional water rights of others. All of the persons who filed statements of opposition, except the state engineer and division engineer, own or have members who own vested or decreed conditional water rights that will be injured if there are out-of-priority depletions to the South Platte River that are not replaced.

A trial was held on May 13, 1985, at which the stipulation was presented, supplemented by exhibits and limited testimony. Following the trial, the district court issued a written order on September 3, 1985, *nunc pro tunc* May 13, 1985, incorporating the stipulated facts and resolving the disputed issues.[6] The court concluded that the water supply pits are wells and that depletions caused by their construction and use of water therefrom must be replaced. The order also reaffirmed Zigan's obligation to replace the water transported off the property with the sand and gravel. The court found that the water in pits nos. 1 and 2 will be beneficially used as part of the reclamation plans for the gravel pits and determined that at the time the reclamation is started the applicant must replace depletions to the South Platte River caused by evaporation of water from the ponds formed in the pits. Finding no evidence, however, that any beneficial use will be made of the water in pits nos. 1 and 2 while the sand and gravel is being mined, the court determined that "the evaporation occurring prior to the commencement of the reclamation plan need not be replaced as part of this plan for augmentation." The court concluded that because Zigan did not propose to replace depletions caused by evaporation from the gravel pits after the reclamation plan is commenced, injury will be caused to other vested water rights or decreed conditional water rights. Therefore, the court denied approval of the proposed plan for augmentation.

Zigan moved to amend the findings and order, challenging the court's conclusion that the use of the water in pits nos. 1 and 2 pursuant to the reclamation plan would be beneficial. In support of this motion, Zigan relied principally upon a technical revision to its reclamation plan which changed the intended land use after mining from "Home sites & wildlife habitat," and "Homesites and open area" to "pond with vegetated shoreline." Zigan had submitted a request for a revision of the reclamation plans to the Mined Land Reclamation Board subsequent to the hearing on May 13, and the request was granted on July 25, 1985. In its motion to amend the district court's findings and order, Zigan asserted that with this change in the land use, the water was no longer to be put to a beneficial use as part of the reclamation plans. A number of the objectors also moved to alter or amend the order, objecting to the court's ruling that replacement water need not be provided to augment losses from evaporation from the ponds during the period while mining operations are in progress. The court determined that the amendment obtained by Zigan did not significantly alter the reclamation plan, and therefore denied Zigan's motion to amend the findings and order.[7] The court also denied all the motions of the objectors. Zigan then took

---

6. The water judge initially referred the application for a plan for augmentation to the water referee, *see* § 37–92–203(7), 15 C.R.S. (1973), but upon motion of the objectors the referee re-referred it to the water judge, *see* § 37–92–304(2), 15 C.R.S. (1987 Supp.).

7. The trial court allowed Zigan the opportunity to propose additional terms and conditions by April 18, 1986. Zigan did not avail itself of this option.

this appeal, and the objectors cross-appealed.

## II.

### A.

The issue before us on Zigan's appeal is whether the trial court properly denied Zigan's application for a plan for augmentation. A plan for augmentation is defined by statute in pertinent part as follows:

"Plan for augmentation" means a detailed program to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by any other appropriate means.

§ 37–92–103(9), 15 C.R.S. (1987 Supp.). The standards by which the adequacy of a plan for augmentation is to be measured are set forth in section 37–92–305(3), 15 C.R.S. (1973), which provides in pertinent part:

A ... plan for augmentation, including water exchange project, shall be approved if such ... plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right. If it is determined that the proposed ... plan as presented in the application would cause such injurious effect, the referee or the water judge, as the case may be, shall afford the applicant or any person opposed to the application an opportunity to propose terms or conditions which would prevent such injurious effect.

The plan for augmentation at issue here must be tested against these standards.

The nature and purpose of the plan for augmentation proposed by Zigan can be gleaned from a reading of the application and amended application submitted to the trial court. Zigan acknowledged that the process of mining sand and gravel results in consumptive use of water "due to moisture in the sand and gravel hauled away from the site and water used for dust suppression purposes." Zigan proposed to offset the depletions to the South Platte River caused by these consumptive uses by providing compensatory water from a well tapping a nontributary source and water represented by shares in a ditch company. The proposed plan for augmentation explicitly recognized that the issue of whether Zigan must replace evaporative losses from the exposed water surface in the pits still had to be resolved, and the augmentation plan made no provision for offsetting such depletions.

In denying approval of the plan for augmentation, the district court made no definitive determinations concerning the adequacy of the plan to prevent the material injury that would otherwise result from use of water in dust control operations and the hauling away of wet sand and gravel.[8] Instead, it relied solely upon the fact that Zigan "[had] not proposed to replace depletions caused by evaporation from the gravel pits after the reclamation plan is commenced," and that "[w]ithout the replacement of these depletions, injury will be caused to other vested water rights or decreed conditional water rights," thereby foreclosing approval of the plan for augmentation under the criterion established by section 37–92–305(3). Zigan does not contend that this determination of injury is erroneous. Indeed, it has stipulated that "[t]he South Platte River is over-appropriated at some or all times of the year," that "[a]t certain times, the water supply of the river is insufficient to satisfy all of the decreed water rights from the river" and that therefore the depletions by evaporation "may cause injury to the vested water rights or decreed conditional water

---

8. The district court held that the water supply pits, as distinguished from the gravel pits, are wells and the depletions caused by their construction and use of water therefrom "must be replaced in this plan for augmentation." It also held that Zigan is not relieved of its agreement, found in the stipulation of facts, that it would "replace the amount of water carried off the property with the sand and gravel."

rights of others." However, Zigan contends that it is not legally responsible for any injury resulting from evaporation from the surface of the ponds, and therefore such injury is not relevant in evaluating the adequacy of the plan for augmentation.

The district court based its conclusion that Zigan is legally responsible for the evaporative loss upon its determination that the water in pits nos. 1 and 2 will be beneficially used as part of the reclamation plans for these gravel pits and that, therefore, when the reclamation is started Zigan must replace depletions to the South Platte River caused by evaporation of water from these gravel pits. The district court did not set forth the analytical framework that led to this conclusion,[9] but we believe that the result is supportable on at least two alternative bases. *See, e.g., Colorado v. Franc,* 165 Colo. 69, 76, 437 P.2d 48, 51 (1968), *cert. denied,* 392 U.S. 928, 88 S.Ct. 2284, 20 L.Ed.2d 1385 (1968) (when the trial court enters a correct judgment for the wrong reason we will nevertheless affirm it); *Allen v. Bank,* 120 Colo. 275, 287, 208 P.2d 935, 941 (1949) (it is not incumbent upon us to determine whether the reasons which prompted the trial court to enter its judgment are legally sound, if a correct judgment is pronounced). First, we conclude that each of pits nos. 1 and 2 is a "well" within the meaning of section 37-90-103(21), 15 C.R.S. (1973), and wells may not be constructed without a permit from the state engineer. As a condition to issuance of such a permit, the state engineer must find that there is unappropriated water available for withdrawal by the proposed well and that the vested water rights of others will not be materially injured. § 37-90-137(2), 15 C.R.S. (1973). Second, we conclude that the construction of the gravel pits results in a "diversion" of water, as that term is defined in section 37-92-103(7), 15 C.R.S. (1973), and that any diversion is subject to an order of discontinuance by the division engineer if the water is required by water users having senior priorities.

## B.

We conclude that pits nos. 1 and 2 are "wells" within the meaning of section 37-90-103(21), 15 C.R.S. (1973), and therefore permits from the state engineer must be obtained in order to construct such facilities. The definitional statute provides:

"Well" means any structure or device used for the purpose or with the effect of obtaining ground water for beneficial use from an aquifer.

§ 37-90-103(21). Although Zigan is not mining in order to obtain ground water, such is the unavoidable result, and therefore the effect, of the mining activity. The broad language "any structure or device" clearly incorporates a structure such as a gravel pit. However, in order to classify the gravel pits as wells, we must also determine that the water is obtained "for beneficial use." *Id.*

Zigan asserts that it will not be placing the water in the ponds to beneficial use as part of its reclamation activities.[10] Zigan

9. The district court apparently concluded that the necessity for augmentation was dependent upon whether the use giving rise to injury to owners of senior rights was a beneficial use, but it did not articulate the reasoning underlying that conclusion. The probable basis for the court's determination is that an "appropriation" can be effected only by putting water to beneficial use, *see* § 37-92-103(3)(a), 15 C.R.S. (1987 Supp.), or that a gravel pit would constitute a "well" only if the water is beneficially used, *see* § 37-90-103(21). Since the evaporation loss from the lakes concededly will cause injury to other appropriators, the characterization of an effect of creation of the lakes as "appropriations" or as the construction of "wells," or both, would require that provision be made for a plan for augmentation to prevent such injury. *See*

§§ 37-92-501, -502, 15 C.R.S. (1973) (administration of water rights in accordance with priorities); § 37-90-137, 15 C.R.S. (1973) (no well permit to be issued unless state engineer finds vested water rights of others will not be materially injured).

10. Zigan also concludes that the rationale for the district court's order denying approval of the plan for augmentation is that the Mined Land Reclamation Act requires a mining operator to make a beneficial use of water as part of its reclamation plan. We perceive no such conclusion underlying the district court's ruling. The district court did not interpret the Mined Land Reclamation Act to require a beneficial use of water, but instead addressed whether Zigan's proposed mining operations will result

initially argues that although the ponds will be made suitable for uses such as recreation and wildlife habitat after mining is complete, it is not proposing to engage in such uses as part of its reclamation activities. We find this purported separation of mining and reclamation operations from the subsequent reclamation use to be artificial and without legal significance for the purpose of review of the plan for augmentation. Zigan's complete operation is more correctly viewed as one that requires the construction of ponds which have as an inherent feature annual evaporation from the surface. Zigan is creating the ponds pursuant to reclamation plans that were required as conditions to issuance of its mining permits, and is also thereby creating the condition that gives rise to the continued evaporation. As the parties have stipulated, no evaporation would occur absent the excavation of the sand and gravel.

Zigan also argues that while some forms of reclamation may involve a beneficial use of water, merely creating a pond with vegetated shoreline does not. The district court, however, concluded that the water in pits nos. 1 and 2 "will be beneficially used as part of the reclamation plans for those gravel pits," and we agree with this conclusion. The reclamation plans call for the construction of ponds with irregular shorelines, which will be suitable for wild fowl and aquatic life and which will be compatible with the development of houses on the surrounding lands. We have held that beneficial use is a broad concept and that characterization of a use as beneficial requires case by case factual analysis. *City & County of Denver v. Sheriff*, 105 Colo. 193, 204, 96 P.2d 836, 842 (1939). In *State v. Southwestern Colorado Water Conservation Dist.*, 671 P.2d 1294, 1322 (Colo. 1983), *cert. denied*, 466 U.S. 944, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984), we noted that "[t]hose engaged in mining are required by various statutes to reclaim land adversely affected by such activity" and determined that "[i]n light of the flexible approach taken in the case law toward application of the 'beneficial use' concept, and given the

in beneficial use of water for reclamation pur-

legislative expressions of concern for reclamation of mined land," land reclamation is a beneficial use. In addition, the legislature specifically provided in section 37–92–103(4), 15 C.R.S. (1973), that "the impoundment of water for recreational purposes, including fishery or wildlife," is a beneficial use. Therefore, we conclude that the use of water in the form of a pond to provide wildlife habitat and enhance the attractiveness of residential environment is a beneficial use. *See Three Bells Ranch Assoc. v. Cache La Poudre Water Users Ass'n*, 758 P.2d 164, 173 (Colo.1988). As a result, a reclaimed gravel pit has all the characteristics necessary to satisfy the statutory definition of a "well."

Zigan argues, however, that we should look to the natural and common understanding of the meaning of the word "well" and insists that a gravel pit is foreign to such a meaning. Based upon this reasoning, Zigan argues that the legislature did not intend to encompass a gravel pit that exposes underground water within the definition of "well." We considered and rejected the same argument in *Three Bells Ranch Assoc. v. Cache La Poudre Water Users Ass'n*, at 174. Zigan also asserts that the requirements of the Mined Land Reclamation Act are comprehensive and demonstrate legislative intent that gravel pits are not wells and that mining operators are not subject to well permit requirements. We also rejected this argument in *Three Bells Ranch Assoc. v. Cache La Poudre Water Users Ass'n*, at 171–72. *See infra* p. 184.

One important consequence of classification of a gravel pit as a well is that a permit for construction of the pit is necessary pursuant to section 37–90–137. Subsection (1) of that section provided that:

[f]rom and after May 17, 1965, no new wells shall be constructed outside the boundaries of a designated ground water basin, nor the supply of water from existing wells outside the boundaries of a designated ground water basin increased or extended, unless the user makes an application in writing to the state engi-

poses.

neer for a "permit to construct a well," in a form to be prescribed by the state engineer.

Subsection (2) sets forth the criteria by which the state engineer is to determine whether a permit can be issued. It provided, in pertinent part:

> Upon receipt of an application for a replacement well or a new, increased, or additional supply of ground water from an area outside the boundaries of a designated ground water basin, accompanied by a filing fee of twenty-five dollars, the state engineer shall make a determination as to whether or not the exercise of the requested permit will materially injure the vested water rights of others. If the state engineer finds that there is unappropriated water available for withdrawal by the proposed well and that the vested water rights of others will not be materially injured, and can be substantiated by hydrological and geological facts, he shall issue a permit to construct a well, but not otherwise....

■ As a result of these statutory requirements, construction of pits nos. 1 and 2 requires the issuance of well permits. In evaluating the sufficiency of a plan for augmentation incident to the sand and gravel mining operations, therefore, it must be determined whether the operations will qualify for issuance of a well permit, which in turn requires an evaluation of the question of material injury to owners of senior rights. For this reason, the trial court was fully justified in considering all the adverse effects of the mining operation on senior water users in order to determine the adequacy of the plan for augmentation. Since evaporation from the ponds was one such effect and since the proposed plan for augmentation made no provision for compensation for evaporative losses incident to reclamation use, the trial court properly denied approval of the plan.

## C.

■ We also conclude that the division engineer may order Zigan to discontinue its diversion of ground water if senior water users are being injured. Section 37-92-502, 15 C.R.S. (1973), authorizes the division engineer to order a discontinuance of diversions in his division under certain circumstances:

> (2) Each division engineer shall order the total or partial discontinuance of any diversion in his division to the extent the water being diverted is not necessary for application to a beneficial use; and he shall also order the total or partial discontinuance of any diversion in his division to the extent the water being diverted is required by persons entitled to use water under water rights having senior priorities, but no such discontinuance shall be ordered unless the diversion is causing or will cause material injury to such water rights having senior priorities.[11]

11. Section 37-92-502(2) also sets forth the factors to be considered by the division engineer in determining whether to issue an order of discontinuance:

> In making his decision as to the discontinuance of a diversion to satisfy senior priorities the division engineer shall be governed by the following: The materiality of injury depends on all factors which will determine in each case the amount of water such discontinuance will make available to such senior priorities at the time and place of their need. Such factors include the current and prospective volumes of water in and tributary to the stream from which the diversion is being made; distance and type of stream bed between the diversion points; the various velocities of this water, both surface and underground; the probable duration of the available flow; and the predictable return flow to the affected stream. Each diversion shall be evaluated and administered on the basis of the circumstances relating to it and in accordance with provisions of this article and the court decrees adjudicating and confirming water rights. In the event a discontinuance has been ordered pursuant to the foregoing, and nevertheless such does not cause water to become available to such senior priorities at the time and place of their need, then such discontinuance order shall be rescinded. If a well has been approved as an alternate means of diversion for a water right for which a surface means of diversion is decreed, such well and such surface means must be utilized to the extent feasible and permissible under this article to satisfy said water right before diversions under junior water rights are ordered discontinued.

A "diversion" as defined in section 37–92–103(7), 15 C.R.S. (1973):

> means removing water from its natural course or location, or controlling water in its natural course or location, by means of a ditch, canal, flume, reservoir, bypass, pipeline, conduit, well, pump, or other structure or device.

The construction of the gravel pits will cause water to be removed from its natural course by means of a reservoir or other structure or device and therefore will result in a "diversion." The parties' stipulation incorporated in the district court's order establishes that the evaporation that will result from this diversion will deplete the flow of the South Platte River and may cause material injury to senior water rights. The order itself states that "[w]ithout the replacement of these depletions, injury will be caused to other vested water rights or decreed conditional water rights." Under these circumstances, the division engineer is required to order the discontinuance of such a diversion pursuant to section 37–92–502.

Zigan argues that section 37–92–502 does not authorize the state or division engineer to regulate evaporative losses from ground water accumulated in gravel pits. Zigan asserts that the legislature could have required all mining operators to replace evaporative losses resulting from the exposure of ground water during mining and reclamation operations, but has purposefully not done so.[12] In support of this proposition, Zigan points to the differences between the Colorado Mined Land Reclamation Act and the Colorado Surface Coal Mining Reclamation Act, §§ 34–33–101 to –137, 14 C.R.S. (1984) (Coal Mining Reclamation Act). The Coal Mining Reclamation Act states with much greater specificity the steps the coal mine operator must take to protect the water in the affected area. Section 34–33–111(1)(m), 14 C.R.S. (1984), provides that the reclamation plan required under the Coal Mining Reclamation Act must describe in detail the measures to be taken during mining and reclamation operations to assure the protection of:

> (I) The quality of surface water and groundwater systems, both on-site and off-site, from adverse effects of the surface coal mining and reclamation operations;
>
> (II) The rights of present users to such water; and
>
> (III) The quantity of water in surface and groundwater systems. Protection measures may include providing water by exchange, substitution, replacement, or augmentation, as appropriate under state law.

Section 34–33–120(2)(h)(VI), 14 C.R.S. (1984), authorizes the permanent impoundment of water on the mining site as part of the reclamation plan, but only when it is adequately demonstrated that:

> [s]uch water impoundments will not result in the diminution of the quality of water or the quantity of water available to water right holders for agricultural, industrial, recreational, or domestic uses. . . .

Zigan points out that the Mined Land Reclamation Act, which applies to other types of mining operations, including sand and gravel, does not contain similar provisions, but provides simply that:

> [d]isturbances to the prevailing hydrologic balance of the affected land and of the surrounding area and to the quality and quantity of water in surface and ground water systems both during and after the

---

**12.** Zigan, the Colorado Contractors Association, and the Colorado Rock Products Association assert that requiring mining operators to replace all evaporative losses will have a serious economic impact on the sand and gravel industry. They contend that such a question is "fraught with important public policy considerations" and is "especially suited for resolution through the legislative process." *R.J.A., Inc. v. Water Users Ass'n,* 690 P.2d 823, 828 (Colo.1984). However, in our view, it is clear that the legislature intended to subject mining operators to the requirements of the Ground Water Management Act, §§ 37–90–101 to –142, 15 C.R.S. (1973 & 1987 Supp.), and the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602, 15 C.R.S. (1973 & 1987 Supp.). *See also* Rule 6.2(a), 2 C.C.R. 407–1 (1978). It is also important to remember that at this point the other water users are bearing the economic burden that Zigan is trying to avoid.

mining operation and during reclamation shall be minimized.

§ 34–32–116(1)(h), 14 C.R.S. (1984). Zigan argues that since the legislature expressly required surface coal operators to replace evaporative losses during mining and reclamation, but did not expressly impose such a requirement on other mining operators, sand and gravel miners need not replace evaporative losses that are incidental to the mining process. Although the Mined Land Reclamation Act does not contain a detailed discussion of measures to be taken to protect the quantity of water in surface and ground water systems, section 34–32–116(1)(h) expresses in a general way the need to accomplish such protection. Furthermore, we find no evidence of legislative intent in the Mined Land Reclamation Act to exempt sand and gravel mining from the provisions of the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602, 15 C.R.S. (1973 & 1987 Supp.), including section 37–92–502. *See Three Bells Ranch Assoc. v. Cache La Poudre Water Users Ass'n*, at 171–72.

As an alternative to discontinuing the diversion, the water user may replace losses to senior water users through a plan for augmentation. The state engineer notes that Zigan chose to apply for approval of a plan for augmentation rather than appeal the order in the injunctive action brought by the state engineer pursuant to section 37–92–502. In order to approve Zigan's plan for augmentation it was necessary that the district court evaluate all the aspects of the sand and gravel mining operation that might result in material injury to senior water users. Since evaporation is one characteristic of the mining operation that could injure senior users, the district court could not properly approve Zigan's plan for augmentation unless Zigan compensated for the losses to the river through the evaporation that would be caused by the mining and subsequent reclamation activities.

III.

The district court determined that since there was no evidence of any beneficial use of the water while the sand and gravel is being mined, the evaporation occurring during that time need not be replaced as part of the plan for augmentation. The state engineer and other objectors cross-appealed this portion of the district court's ruling, arguing that Zigan should also be required to replace those evaporative losses that occur during mining. The state engineer asserts that reclamation, which is a beneficial use of water, is an ongoing activity that begins with the initial excavation of the pits and initiation of the mining operation.[13] Therefore, the state engineer argues, augmentation is required from the commencement of the mining operations. The state engineer also contends that even if the beneficial use does not take place until mining ceases, augmentation is required for all evaporative losses.

We agree that Zigan must replace all evaporative losses that occur during the excavation and enlargement of the gravel pits. Since the gravel pits are wells, the excavation that takes place during mining is part of the process of constructing the well. Pursuant to section 37–90–137, the water losses incurred during construction of a well must be replaced. Alternatively, in light of our analysis in section II(C), we conclude that the state engineer has the authority pursuant to section 37–92–502 to order a discontinuance of diversions that injure senior water rights, regardless of whether there is a beneficial use. The water user may choose to develop a plan for augmentation rather than discontinuing the diversion.

IV.

In summary, we conclude that the district court properly denied Zigan's applica-

---

13. The Mined Land Reclamation Act provides that before an operator may obtain a permit for mining, the operator must develop a plan of reclamation and submit it to the Reclamation Board for approval. § 34–32–112. Each year after the permit has been obtained, the operator must submit plans showing the mining that has occurred in the area and the reclamation that has been accomplished. § 34–32–116(1)(a).

tion for approval of a plan for augmentation. However, we reverse the district court's conclusion that evaporative losses prior to the completion of mining and commencement of reclamation use need not be replaced. Accordingly, we affirm the judgment in part, reverse the judgment in part, and remand the case to the district court for entry of judgment consistent with this opinion.