William S. VANCE, Jr.; Elizabeth S. Vance; James G. Fitzgerald; and Mary Theresa Fitzgerald; Plaintiffs–Appellees

v.

Dick WOLFE, P.E., in his official capacity as the Colorado State Engineer; and Rege W. Leach, P.E., in his official capacity as Division Engineer of Water Division 7, Defendants–Appellants

and

BP America Production Company, Defendant–Intervenor–Appellant.

No. 07SA293.

Supreme Court of Colorado, En Banc.

April 20, 2009.

White & Jankowski, LLP, Sarah A. Klahn, Bridget A. McCann, Denver, Colorado, Attorneys for Plaintiffs–Appellees.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, John J. Cyran, First Assistant Attorney General, Water Rights Unit, Natural Resources and Environmental Section, Denver, Colorado, Attorneys for Defendants–Appellants.

Davis Graham & Stubbs LLP, Zach C. Miller, Steven E. Marlin, Denver, Colorado, Attorneys for Defendant–Intervenor–Appellant.

MacDougall, Woldridge & Worley, P.C., Julianne M. Woldridge, Colorado Springs, Colorado, Attorneys for Amicus Curiae Purgatoire River Water Conservancy District.

Bernard Lyons Gaddis & Kahn, P.C., Jeffrey J. Kahn, Madoline E.S. Wallace, Longmont, Colorado, Attorneys for Amicus Curiae City of Trinidad, Colorado.

Goldman, Robbins & Nicholson, P.C., Jeffery P. Robbins, Josh W. Mack, Durango, Colorado, Attorneys for Amicus Curiae La Plata County, Colorado.

Holland & Hart LLP, Christopher L. Thorne, William H. Caile, Denver, Colorado, Attorneys for Amicus Curiae Pioneer Natural Resources USA, Inc.

Brownstein Hyatt Farber Schreck, LLP, Wayne F. Forman, Denver, Colorado, Attorneys for Amicus Curiae Colorado Oil & Gas Association.

Western Resource Advocates, Bart Miller, Boulder, Colorado, Trout Unlimited, Mely Whiting, Pagosa Springs, Colorado, Attorneys for Amici Curiae Western Resource Advocates, Trout Unlimited, San Juan Citizens' Alliance, and North Fork Ranch Landowners' Association.

Justice EID delivered the Opinion of the Court.

This is an appeal from a declaratory judgment action brought in District Court, Water Division 7 by William S. Vance, Jr., Eliz-

abeth S. Vance, James G. Fitzgerald, and Mary Theresa Fitzgerald (collectively, the "Ranchers"). The Ranchers asked the water court to determine the legal obligations of the State Engineer and Division Engineer for Water Division 7 (collectively the "Engineers") regarding well permits and augmentation plans when ground water is diverted for the purpose of coalbed methane ("CBM") production. Specifically, the Ranchers sought a declaration that withdrawal of ground water during the CBM process constitutes a "beneficial use" giving rise to appropriative water rights subject to administration and permitting by the Engineers under the Water Right Determination and Administration Act of 1969, §§ 37–92–101 through –602, C.R.S. (2008) ("1969 Act"), and the Colorado Ground Water Management Act, §§ 37–90–101 through –143, C.R.S. (2008) ("Ground Water Act").

The Engineers and BP America Production Company ("BP"), an intervenor in the action, opposed the Ranchers' request for a declaratory judgment, arguing that the use of water during CBM production is not a "beneficial use." The water court held for the Ranchers, finding that CBM production constitutes an appropriation for a "beneficial use," and that consequently, the Engineers cannot allow out-of-priority diversions for CBM production without a well permit and, where necessary, a decree adjudicating an augmentation plan. Dist. Ct. Water Div. 7 Order: Motions for Summary Judgment, July 2, 2007. This direct appeal followed.

We now affirm the water court. The 1969 Act defines "beneficial use" as "the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made." § 37–92–103(4), C.R.S. (2008). Under the language of the 1969 Act, the CBM process "uses" water—by extracting it from the ground and storing it in tanks—to "accomplish" a particular "purpose"—the release of methane gas. The extraction of water to facilitate CBM production is therefore a "beneficial use" as defined in the 1969 Act. We reject the Engineers' and BP's argument that water used in CBM produc-

tion is merely a nuisance rather than a "beneficial use." On the contrary, the use of water in CBM production is an integral part of the CBM process itself. The presence and subsequent controlled extraction of the water makes the capture of methane gas possible. As our precedent in the gravel cases makes clear, the fact that the water used during the CBM process may become a nuisance *after* it has been extracted from the ground and stored in above-ground tanks (that is, after it has been beneficially used) does not prevent a finding that the water is put to a beneficial use. *See Three Bells Ranch Assocs. v. Cache La Poudre Water Users Ass'n,* 758 P.2d 164 (Colo.1988), and *Zigan Sand & Gravel, Inc. v. Cache La Poudre Water Users Ass'n,* 758 P.2d 175 (Colo.1988). Accordingly, we affirm the order of the District Court for Water Division 7 and remand for further proceedings consistent with this opinion.

### I.

Coalbed methane natural gas is produced from more than 4,000 existing wells drilled into deep coalbed formations in the San Juan Basin in southwestern Colorado. CBM wells are drilled between 2,000 and 3,000 feet below the surface and exist to facilitate the extraction of methane gas. The gas is naturally absorbed on the internal surface of the coal and held in place by hydrostatic pressure from ground water that fills the cleats of the coal. When pressure is reduced by removing water from the cleats and bringing it to the surface, methane gas desorbs from the coal and flows through the cleat system to a collection well. The removed water, which has been brought to the surface, is held in storage tanks. At this point, a small quantity of the water is lost to evaporation. At a later time, the water is typically reinjected via underground injection control wells into designated geologic formations that lie deeper than the aquifer from which the methane is produced. The reinjection control wells are regulated by the Colorado Oil and Gas Conservation Commission ("COGCC"). Except under limited circumstances, the Engineers have not, thus far, issued permits for the CBM wells because they believe they are under no obligation to do so.

The Ranchers possess water rights located in Water Division 7 that lie in sources tributary to the Piedra River and the Pine River. The Ranchers use their water rights for irrigation, stock watering, domestic uses, farming, and piscatorial uses. In their declaratory judgment action before the water court, the Ranchers argued that the water used in CBM production constitutes out of priority depletions that are injurious to their vested senior water rights.[1] They contended that the use of water in the CBM process is a "beneficial use" and that the Engineers are statutorily obligated to require well permits for CBM wells pursuant to the Ground Water Act. The Engineers asserted that the CBM wells are not "wells," as defined by the Ground Water Act, because they do not put water to a "beneficial use." Instead, they claimed that the extracted water is merely "produced water," which is exempt from the prior appropriation doctrine and instead regulated exclusively by the COGCC.

In granting summary judgment in the Ranchers' favor, the water court began with the assumption, unchallenged here, that this case involves tributary water. *See Safranek v. Limon,* 123 Colo. 330, 334, 228 P.2d 975, 977 (1951) (holding that under Colorado law, all ground water is presumed to be tributary until proven otherwise). The water court found that the extraction of water during the CBM process was a beneficial use constituting both a "well" under the Ground Water Act and an "appropriation" under the 1969 Act, because "the removal of water ... is not incidental" but rather "occurs as the result of the active and intentional pumping of water to accomplish the intended purpose." The water court therefore concluded that CBM production requires a water well permit and, where necessary, a decree adjudicating an augmentation plan. The water court noted that "[t]he conclusion is bolstered by the overall intent of the water law scheme. By passing the 1969 Act, the General Assembly intended to integrate the appropriation, use, and administration of underground water ... [because under Colorado law] adjudication and administration are essential to protection of water rights." (internal citations and quotations omitted). In finding beneficial use, the water court declined to defer to the Engineers' interpretation of the term and found that the regulation of CBM production by the COGCC was not exclusive.

The Engineers and BP appealed to this court pursuant to C.A.R. 1(a)(2); § 13–4–102(1)(d), C.R.S. (2008); and Colo. Const., art. VI, § 2. In their appeal, they challenge the water court's ruling that the extraction of water in the CBM process is a beneficial use giving rise to an appropriative water right.

We now affirm the water court's ruling that the extraction of water for the purpose of CBM is a beneficial use giving rise to an appropriative water right. As a result, CBM wells are subject to permitting, adjudication, and administration pursuant to the 1969 Act as well as the Ground Water Act.

## II.

Through the enactment of the Ground Water Act and the 1969 Act, the General Assembly delegated responsibility for the administration, distribution, and regulation of the waters of the state to the state and division engineers. *Danielson v. Jones,* 698 P.2d 240, 247 (Colo.1985). The issue presented by this appeal is whether the Engineers are required to permit CBM wells under the provisions of the Ground Water Act—that is, whether CBM production puts water to a beneficial use such that CBM wells are "wells" as defined in that Act.

Under the Ground Water Act, "no new wells shall be constructed outside the boundaries of a designated ground water basin [2]

---

1. The Ranchers relied on a study by the U.S. Forest Service and the Bureau of Land Management entitled, "A Draft Environmental Impact Statement for the Northern San Juan Basin Coal Bed Methane Project Volume I," that concluded, "[b]efore CBM development in the northern San Juan Basin, discharge from the Fruitland aquifer to the Animas, Florida, *Pine* and *Piedra* Rivers totaled approximately 195 acre-feet per year, [and] [m]odeling by Cox et al. (2001) has demonstrated that CBM development has and will continue to intercept groundwater that would normally discharge to these rivers." (emphasis added).

2. " 'Designated Ground Water Basin' means that area established by the ground water commis-

. . . unless the user makes an application in writing to the state engineer for a permit to construct a well." § 37–90–137(1), C.R.S. (2008). The act defines "well" as "any structure or device used for the purpose or with the effect of obtaining ground water for a *beneficial use* from an aquifer." § 37–90–103(21)(a), C.R.S. (2008) (emphasis added). Thus, the primary question is whether CBM production obtains water for a "beneficial use," such that it requires a well permit under the Ground Water Act in connection with an "appropriation" under the 1969 Act.

As we have noted in the past, "beneficial use" is the essential premise of Colorado water law. *Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson,* 990 P.2d 46, 53 n. 7 (Colo.1999). In Colorado, "the right to divert the unappropriated waters of any natural stream to *beneficial use* shall never be denied," and the water of every natural stream is "the property of the public," Colo. Const., art. XVI §§ 5, 6 (emphasis added), subject to appropriation and actual beneficial use. *See Pagosa Area Water & Sanitation Dist. v. Trout Unlimited,* 170 P.3d 307, 313 (Colo.2007).

■ An "appropriation" is "the application of a specified portion of the waters of the state to a *beneficial use.*" § 37–92–103(3)(a), C.R.S. (2008) (emphasis added). Once an appropriation occurs, it gives rise to a vested water right subject to permitting and adjudication. *In re Concerning Application for Water Rights of Turkey Cañon Ranch LLC,* 937 P.2d 739, 744 (Colo.1997). Prior appropriated rights have priority over subsequent junior rights. *Empire Lodge Homeowners' Ass'n v. Moyer,* 39 P.3d 1139, 1148–49 (Colo. 2001) (noting that Colorado water law emphasizes the adjudication and administration of decreed water rights in order of their *priority* ).

Consequently, we begin with the central question presented by this case—whether CBM production is a "beneficial use" giving rise to an appropriative water right subject to water well permitting, water court adjudication, and administration by the Engineers. We find that it is. We then turn to the

sion in accordance with section 37–90–106.''

Engineers' and BP's assertion that we must defer to the Engineers' interpretation of the term "beneficial use" and conclude that we need not defer. Finally, we consider, and ultimately disagree with, the argument that the regulation of CBM production is exclusively within the province of the COGCC.

### A.

■ While the term "beneficial use" is undefined in the Colorado Constitution, the 1969 Act defines it broadly as "the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made." § 37–92–103(4), C.R.S. (2008). Under the language of the 1969 Act, the CBM process "uses" water—by extracting it from the ground and storing it in tanks—to "accomplish" a particular "purpose"—the release of methane gas. The extraction of water to facilitate CBM production is therefore a "beneficial use" as defined in the 1969 Act.

Arguing against this interpretation, the Engineers and BP assert that the use of the water during the CBM process cannot be a "beneficial" one because the water is merely a nuisance. They stress that the goal of the CBM process is to capture the gas, not the water. The water, they continue, is simply an unwanted byproduct of the process. In sum, they question how the use of the water in this case can be termed "beneficial" when they consider it to be a hindrance.

First, based on the gravel cases, we disagree. *See Three Bells Ranch Assocs. v. Cache La Poudre Water Users Ass'n,* 758 P.2d 164 (Colo.1988), and *Zigan Sand & Gravel, Inc. v. Cache La Poudre Water Users Ass'n,* 758 P.2d 175 (Colo.1988). In *Three Bells* and *Zigan,* gravel mining operators dug pits in the ground that were deeper than the water table in order to excavate the gravel. *Three Bells,* 758 P.2d at 166; *Zigan,* 758 P.2d at 177. The gravel pits then filled up with water, some of which was lost to evaporation. *Zigan,* 758 P.2d at 177. The gravel pits were eventually reclaimed and

§ 37–90–103(7), C.R.S. (2008).

turned into ponds that could support recreation and wildlife. *Id.* at 182. In both cases, the operators argued that the water involved in the mining process was merely a nuisance to their operations and, therefore, could not effectuate an appropriation of the water. *See Three Bells,* 758 P.2d at 170; *Zigan,* 758 P.2d at 182. We rejected this argument, holding that the pits constituted "wells" for the purpose of obtaining water by appropriation for the "beneficial use" of wildlife habitats and recreation. *See Three Bells,* 758 P.2d at 175; *Zigan,* 758 P.2d at 181–82; *see also State v. Sw. Colo. Water Conservation Dist.,* 671 P.2d 1294, 1322 (Colo.1983) (holding that land reclamation and dust suppression are beneficial uses of water).

In *Three Bells,* we noted that "[a]lthough [the operator] is not digging the pits for the purpose of capturing ground water, and the water that accumulates hinders mining operations, the interception of ground water is the *inevitable result* of excavating pits to a depth below the water table." 758 P.2d at 174 (emphasis added); *see also Zigan,* 758 P.2d at 181. The same is true with the CBM process. While the purpose of the mining operation is to obtain gas, not water, the withdrawal of water and its accumulation in the storage tanks is the "inevitable result" of the CBM process.

In fact, the presence of water and its subsequent extraction during CBM production is far more than an "inevitable result." Indeed, the presence and extraction of water are integral components to the entire CBM process. CBM producers rely on the presence of the water to hold the gas in place until the water can be removed and the gas captured. Without the presence and subsequent extraction of the water, CBM cannot be produced. As both *Three Bells* and *Zigan* make clear, the fact that the water used during the CBM process may become "a nuisance" *after* it has been extracted from the ground and stored in above ground tanks (that is, after it has been "beneficially used") does not prevent a finding that the water is put to a beneficial use. While the Engineers and BP are cor-

rect that no Colorado case has *specifically* held that water used during CBM production is a beneficial use, this fact does not prevent us from finding such a beneficial use where our case law and the language of the 1969 Act so dictate. *See Sw. Colo. Water Conservation Dist.,* 671 P.2d at 1321–22.

That the water used in CBM production is integral to the process itself distinguishes this case from a host of other instances in which nuisance water is merely removed but not beneficially used. The Engineers and BP argue that the use of water in CBM production is akin to snow removal, removal of flood water from a subsurface mine, and storm water control at construction sites—all of which constitute mere removal of nuisance water rather than beneficial uses.[3] We find the analogy attempted by the Engineers and BP to be a faulty one. In their examples, the water is exclusively a nuisance and not integral to the task at hand. In contrast, CBM production cannot occur without the presence and controlled removal of the water.

The Engineers and BP point out that the beneficial use of the water in the gravel cases—the creation of ponds for recreation and wildlife—came *after* the extraction of the water. They argue that the gravel cases therefore create a requirement that the beneficial use be "subsequent" or "collateral" to the withdrawal of the water. The use of water in CBM production cannot be deemed such a beneficial use, they conclude, because the withdrawal and benefit, if any, occur simultaneously.

Again, we find that our case law forecloses this argument. While it is true, as the Engineers and BP point out, that the gravel cases describe the beneficial use as the subsequent wildlife and recreational use, *see, e.g., Zigan,* 758 P.2d *passim,* those cases do not set a *requirement* that the beneficial use always be subsequent or collateral to the withdrawal and collection of water. Indeed, we have previously recognized beneficial uses that actually coincide with the withdrawal and storage of water. For example, in *Pueblo West*

---

**3.** For purposes of this appeal, we assume without deciding that the examples cited by the Engi-

neers and BP are not beneficial uses.

*Metropolitan District v. Southeastern Colorado Water Conservancy District,* 689 P.2d 594, 603 (Colo.1984), we held that the capture and storage of flood water is a beneficial use of the water. There, as here, the capture and storage of the water coincided with the beneficial use—the prevention of floods. Furthermore, we note that the statutory definition of "beneficial use" contains no such temporal element. *See* § 37–92–103(4), C.R.S. (2008).

Finally, the Engineers and BP argue that to find a beneficial use in this case would be inconsistent with section 37–90–137(7), C.R.S. (2008) of the Ground Water Act, which provides: "In the case of dewatering of geologic formations by removing *nontributary* [4] ground water to facilitate or permit mining of minerals: (a) No well permit shall be required unless the *nontributary* ground water being removed will be beneficially used." (emphasis added). The Engineers and BP contend that this statutory provision demonstrates a difference between dewatering a mine to facilitate mining and doing so for a beneficial use. They also assert that, if we find a beneficial use in this case, the phrase "unless the nontributary ground water being removed will be beneficially used" would be rendered meaningless.

Contrary to the argument of the Engineers and BP, we find that section 37–90–137(7)(a) actually supports a finding of beneficial use in this case. Section 37–90–137(7)(a) recognizes that permitting is required where, as here, the removed water is beneficially used.

■ Furthermore, we observe that the provision does not control our inquiry because the water at issue here is presumed to be tributary. *See Safranek v. Limon,* 123 Colo. 330, 334, 228 P.2d 975, 977 (1951). To the extent that the Engineers and BP assert that the water is nontributary, they must overcome the presumption of tributariness in an evidentiary hearing in the water court below. *See American Water Dev., Inc. v. Alamosa,* 874 P.2d 352, 389 (Colo.1994). Because nontributary groundwater is not subject to the constitutional right of prior appropriation, the General Assembly has plenary authority and can wholly exempt it from regulation. *See In re the Application for Water Rights of Park County Sportsmen's Ranch LLP,* 986 P.2d 262, 269 (Colo.1999). In sum, we find that section 37–90–137(7)(a) does not change our conclusion that the extraction of water during CBM production is a beneficial use in the tributary water context, which we presume in this case.

As the water court noted, the Ranchers' central concern is the protection of their vested senior water rights. We agree with the district court that our prior appropriation system exists to protect water rights holders. Here, the extraction, storage, and reinjection of water during CBM make the water inaccessible to other water rights holders such as the Ranchers. When the water is stored in surface tanks, a small quantity is lost to evaporation. At a later time, the water is typically reinjected, via underground injection control wells, into designated geologic formations that lie deeper than the aquifer from which the methane is produced. Consequently, "beneficial use" also means use of water for a designated purpose—the result of which is to make the water inaccessible to other water rights holders. *See, e.g., Three Bells,* 758 P.2d at 171 (noting, "we believe that when mining operations *affect water rights* it is necessary for the operator to achieve compliance with the Ground Water Management Act and the 1969 Act." (emphasis added) ).

■ In response to the Ranchers' concern about injury to their vested senior water rights, the Engineers, joined by BP, argue that their duty under the 1969 Act to curtail material injury [5] is sufficient to protect the

---

**4.** Nontributary ground water is defined as "ground water, located outside the boundaries of any designated ground water basins in existence on January 1, 1985, the withdrawal of which will not, within one hundred years, deplete the flow of a natural stream ... at an annual rate greater than one-tenth of one percent of the annual rate of withdrawal." § 37–90–103(10.5), C.R.S. (2008).

**5.** Pursuant to section 37–92–502(2)(a), C.R.S. (2008) of the 1969 Act,

[The Engineer] shall also order the total or partial discontinuance of any diversion in his

Ranchers' interests. In other words, the Engineers and BP argue that it is not necessary to deem the extraction of water during the CBM process a "beneficial use" of water. But the fact that the Engineers concede that they are required to protect against material injury pursuant to the 1969 Act does not eliminate the Ranchers' concerns about protecting their vested senior water rights. The 1969 Act provision, requiring the Engineers to curtail material injury, does not afford the same protection as permitting and permanent augmentation plans. Permitting is a comprehensive process that provides notice to potentially injured parties and involves the determination of whether there is unappropriated water available for appropriation and whether an appropriation can be made without injury. *See Buffalo Park Dev. Co. v. Mountain Mut. Reservoir Co.,* 195 P.3d 674, 683–86 (Colo.2008). The statutory design places the determination of the presence or absence of a water right with the water court, not the Engineers. *See Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson,* 990 P.2d 46, 58 (Colo.1999) ("Our state legislature and courts ... have never accepted the proposition that water officials may determine the water rights of citizens; this is a judicial function under the adjudication statutes."). Finally, we note that the Engineers took no action with regard to diversions in this case.

▮ We emphasize that determining the boundaries of "beneficial use" requires careful case-by-case factual analysis, *Zigan,* 758 P.2d at 182, and our holding today addresses the unique circumstances involved in CBM production. The definition of "beneficial use," however, is a "broad" one, *see id.,* and we agree with the Ranchers that it is broad enough to cover the extraction of water to facilitate CBM production. In rendering our decision, we observe that the General Assembly may choose to make modifications to the statutes in light of our opinion.[6] *See Sw.*

*Colo. Water Conservation Dist.,* 671 P.2d at 1323–24.

### B.

▮ The Engineers and BP argue that because "beneficial use" is an ambiguous term, we should defer to the Engineers' interpretation and hold that the extraction of water to facilitate CBM production is not a beneficial use of water. While we may take into account agency interpretations, we are not bound by them. *See Colo. Mining Ass'n v. Bd. of County Comm'rs,* 199 P.3d 718, 731–32 (Colo.2009). Here, the Engineers' interpretation of the term "beneficial use" is contrary to the 1969 Act's definition of that term. Their interpretation also conflicts with our case law interpreting the term. We therefore decline to defer to the Engineers' interpretation.

### C.

▮ In their final argument, the Engineers assert that the legislature intended that CBM wells be regulated not by them but rather exclusively by the Colorado Oil and Gas Conservation Commission. They contend that, rather than subjecting oil and gas wells to possibly overlapping, inconsistent, or conflicting regulatory requirements, the General Assembly recognized and sought to protect the regulatory authority of the COGCC. We disagree with the Engineers' argument and hold that COGCC does not have exclusive regulatory authority over the extraction of water in CBM production.

In support of their argument, the Engineers point to the fact that the COGCC has been given extensive authority to regulate the production of oil and gas. *See* Oil and Gas Conservation Act, §§ 34–60–101 through –129, C.R.S. (2008). Yet, as the Engineers acknowledge in their brief, simply because "the General Assembly granted the

---

division to the extent that the water being diverted is required by persons entitled to use water under water rights having senior priorities, but no such discontinuance shall be ordered unless the diversion is causing or will cause material injury to such water rights having senior priorities.

**6.** Although the Colorado Constitution subjects tributary water to constitutional constraints, it does not define the term "beneficial use." The General Assembly thus has authority to define the term within those constraints, as it has done in the 1969 Act.

COGCC primary authority over oil and gas operations does not exempt oil and gas wells from complying with applicable Colorado water law." *See also Three Bells,* 758 P.2d at 171 ("[W]hen mining operations affect water rights, it is necessary for the operator to achieve compliance with the [Ground Water Act and the 1969 Act]."). The Engineers fail to point to a specific provision in the Oil and Gas Conservation Act that exempts oil and gas production from the 1969 Act or the Ground Water Act, and we decline to create such an exemption here.

The Engineers also point to section 37–91–102(16)(b)(I), C.R.S. (2008) of the Water Well Construction and Pump Installation Contractors Act, which exempts from regulation "those wells subject to the jurisdiction of the [COGCC], as provided in article 60 of 34, C.R.S." The Engineers' reliance on this provision misses the mark as well. While section 37–91–102(16)(b)(I) might exempt oil and gas wells from the provisions governing water well construction, *see generally* § 37–91–101, C.R.S. (2008) (noting, among other things, the importance of the "proper location, construction, repair, and abandonment of wells"), it does not exempt them from the requirements of the 1969 Act and the Ground Water Act.

In sum, while the production of oil and gas is subject to extensive regulation by COGCC, it is also subject to the 1969 Act and the Ground Water Act. And, as noted above, we find that the extraction of water to facilitate CBM production is a beneficial use under those provisions.

### III.

Accordingly, we affirm the order of the District Court Water Division 7 and remand for further proceedings consistent with this opinion.

Justice COATS concurs in part and dissents in part.

Justice COATS, concurring in part and dissenting in part.

Although I agree that the extraction of groundwater in the coalbed methane ("CBM") production process falls within the administrative responsibilities of the state and division engineers, I do not agree that this process, in itself, amounts to a "beneficial use" of the water extracted, for either constitutional or statutory purposes. Furthermore, since the engineers have an obligation to regulate the removal of the waters of the state from their natural course or location, whether they are diverted for beneficial use or not, I do not consider it either necessary or appropriate to resolve the question of beneficial use as a declaratory judgment for the protection of senior appropriators. I therefore respectfully dissent from all but the conclusion of part II. C. of the majority's opinion.

The division engineer has a statutory obligation to order the discontinuance of any diversion not necessary for application to a beneficial use, *as well as* any diversion of water required to satisfy senior rights. § 37–92–502(2)(a), C.R.S. (2008). The state and division engineers would have us read this provision as requiring them to order discontinuance only to the extent necessary to prevent material injury to senior water rights, but otherwise they do not deny their obligation. In fact, however, section 502(2)(a) contains two separate obligations, the first of which applies expressly to any diversion that is not necessary for application to a beneficial use. Any statutory construction imputing to this duty the further condition of material injury would make it indistinguishable from the second obligation and effectively read it out of the statute.

The CBM process therefore does not escape administration by the engineers, whether it amounts to a beneficial use of the extracted water or not. The question of beneficial use goes only to the producer's right to have a permitted well and to augment (or do whatever else is necessary) to acquire sufficient right to divert out of priority. Whether, or under what circumstances, CBM producers may be entitled to permitted wells (as distinguished from having their diversions curtailed altogether) is not a matter of concern to the plaintiff appropriators, whose right to a declaratory judgment is contingent upon a realistic threat of injury to their rights.

While I would therefore not address the question of beneficial use at all, I believe that in resolving the matter as it has, the majority erroneously (and unnecessarily) ties the hands of the legislature by suggesting that CBM producers have a constitutional right to appropriations for this purpose. Of even greater concern, it appears to me that the majority interprets "beneficial use" so broadly as to encompass virtually any diversion of the waters of the state that is not an inefficient way of accomplishing its purpose, whatever that purpose may be. By no longer requiring that these waters even be put to some use, but rather that it simply be advantageous to someone to relocate them from their natural course or location, I believe the majority has effectively eliminated the requirement altogether, making an efficient act of diverting sufficient for an appropriation.

While we have undoubtedly contributed to the current state of affairs by sanctioning the use of declaratory judgments as a vehicle for forcing the permitting of wells for which no permits have been sought and no application made, *see Three Bells Ranch Assocs. v. Cache La Poudre Water Users Ass'n*, 758 P.2d 164 (Colo.1988), we have never before suggested that extraction alone could satisfy the beneficial use requirement. On the contrary, in the so-called gravel cases, we went to extraordinary lengths to classify collateral displacements of water as wells needing a permit solely because accompanying statutorily-required reclamation plans would have applied the water to a beneficial use. *Id.* at 174–75; *Zigan Sand & Gravel, Inc. v. Cache La Poudre Water Users Ass'n*, 758 P.2d 175, 181–82 (Colo.1988). Far from holding that the diversion of water occurring as a by-product of gravel mining would be a beneficial use in itself, we discovered an intent to appropriate in the miners' proposals to put the diverted water to approved wildlife and recreational uses.

Similarly, the flood control cases relied on by the majority cannot stand for the proposition that the relocation of water, as long as it is done efficiently, constitutes a beneficial use. *See Pueblo West Metro. Dist. v. Se.*

*Colo. Water Conservancy Dist.*, 689 P.2d 594, 603 (Colo.1984); *see also Bd. of County Comm'rs v. Crystal Creek Homeowners' Ass'n*, 14 P.3d 325, 338 (Colo.2000). Thin as our rationale in *Pueblo West* may have been, it dealt with the limited situation of relocation and storage for a public purpose, implicitly approved by the General Assembly in its provision for the creation of conservancy districts, having both the right and duty to acquire and hold water rights as necessary to prevent flooding. We there reasoned that the legislature would not have granted conservancy districts these powers unless it considered flood prevention a beneficial use.

Whether the General Assembly chooses to authorize the displacement of waters of the state for the production of methane gas, and if so, in what manner it chooses to best regulate that process, I consider to be matters entirely within its purview. I do not believe, however, it has yet done so. By so loosening the requirement of beneficial use for valid appropriations, and by tying its expanded definition of "beneficial use" to constitutional protections against curtailing the right to appropriate unappropriated waters, I fear the majority not only authorizes appropriation under the existing statutory scheme for virtually any reason but also inadvertently implies a constitutional limitation on the power of the legislature to limit this protection in the future.

Except to the extent that I believe the extraction of groundwater in the coalbed methane production process necessarily falls within the administrative responsibilities of the state and division engineers, regardless of its beneficial use, I therefore respectfully dissent.

Justice MARTINEZ does not participate.