## No. 18,557.

### THE TOWN OF GENOA *v.* GILBERT O. WESTFALL.

(349 P. [2d] 370)

Decided February 8, 1960.   Rehearing denied February 29, 1960.

Messrs. THOMAS & THOMAS, for plaintiff in error.

Messrs. CHUTLKOW & ATLER, for defendent in error.

*In Department.*

Opinion by MR. JUSTICE MOORE.

DEFENDANT in error was plaintiff in the trial court and we will refer to him as plaintiff or Westfall. Plaintiff in error was defendant in the lower court and will be referred to as the town or Genoa.

Westfall brought the action to enjoin the town from intercepting and diverting water forming the supply source of certain springs on his lands and to recover damages allegedly sustained by him because of the past diversions of said water and the resultant "drying up" of his springs.

The town alleged defenses which included a general denial of all pertinent facts, a claim of ownership and prior right to the water being diverted by the town under the doctrine of prior appropriation, and that the water was not tributary to any stream and belonged to the town because the aquifer from which it was taken was on land belonging to it.

After a lengthy trial the trial court, with commendable care, prepared a detailed analysis of the contentions of the parties and the evidence upon which they were grounded.

The town owns eighty acres of land which is immediately north of the eighty acres upon which Westfall resides and upon which are located the springs which he alleged had been "dried up" by the acts of the town. Westfall also owns 7280 acres lying immediately south and east of the 80 acres upon which his home is located. The controversy between the parties can best be shown by quotations from the findings of the trial court as follows:

"That the Town Eighty is located along the bluffs south of the Rock Island Railroad, the north boundary thereof being at the top of the bluffs and the south boundary at or near the bottom. The Westfall Eighty is immediately south of the Town Eighty, the north half thereof being rather rolling and, from thereon south and east for several miles, the land is comparatively level and good pasture land. The Westfall ranch improvements are bout (sic) 40 rods from the west boundary of the Westfall Eighty and about midway between the north and south boundaries of the Eighty.

"The Court further finds that the land in this part of the State is underlaid with Pierre shale, a formation impervious to water. That in ages past a large river flowing toward the east cut a wide channel in the Pierre shale, forming the bluffs on the north and south sides of the valley through which the Big Sandy now runs. The Ogallala lies above the Pierre shale as originally laid down and is found on top of the bluffs and extending to the north and east. The overburden on the slopes of the bluffs and in the valley consists of weathered Pierre shale, clay, gravel, and wash brought in and deposited by the streams and waters flowing into and through the valley. The alluvium in the bluffs varies in depth from four to thirteen feet, being deeper in the gulches and flatter portions than on the sides of the bluffs.

"That the Town Eighty is very rough, consisting wholly of bluff land not suitable for agriculture and very poor pasture land. The land is very precipitous. From the top of the bluffs to the Westfall north boundary there is a drop in elevation of approximately 125 feet and, from the top of the bluffs to the Westfall improvements, a drop of approximately 175 feet. Four deep draws or gulches run through the Town Eighty north to south. The two on the west converge on the Westfall Eighty above the Westfall improvements and, north of what has been referred to as the garden plot, curve

rather sharply to the west (as shown in Defendant's Exhibit 4) and then curve around the edge of the garden plot and through a corner of the Westfall corrals and then run in a southerly direction below the Westfall corrals where the draw is joined by the two easterly draws or gulches above mentioned. At the bottom of the gulches on the Town Eighty and through the Westfall Eighty and for some distance beyond water runs in an open ditch with steep banks and a well defined water course in the bottom. The open ditch disappears for some distance in Section 19, the water in times of freshets or large runoffs from melting snows spreads out and flows over a swail, breaks out again in an open ditch at or near the public road between Sections 19 and 30 and continues in a southeasterly direction and joining or being joined by other streams flows into the Big Sandy below Hugo, Colorado. (See aerial photos, Defendant's Exhibits 5 and Plaintiff's Exhibit F).

"That, because of the precipitous character of the land and the nature of the soil, rainfall or water from melting snow rapidly finds its way into the gulches either as surface runoff or by percolation and runs down the gulches as surface flow or underflow to the Westfall improvements. The total area thus drained is approximately 100 acres and water falling on the watershed as rain or snow is concentrated or collected and flows through the narrow neck between the Westfall corrals and the garden plot.

## "THE DEFENDANT'S CLAIM TO WATER

"The Court finds that one, Givens, obtained U. S. Patent to the North Half of the Southwest Quarter of Section 18 only, in 1886. He, prior to that date, conveyed to McIntyre and Thurlow, and Thurlow conveyed to McIntyre in 1896. McIntyre owned adjoining lands and other lands in Lincoln County and was engaged in the sheep business.

"That there were two well known springs on the North Half of the Southwest Quarter of Section 18; the larger

one, which shall be called 'McIntyre No. 1,' was located in the second large gulch or draw from the west and approximately 6 or 8 rods from the north boundary of said land. This was a contact spring, breaking out at or near the top of the Pierre shale as originally laid down. The source of the water being water collected in the aquifer above the Pierre over an indefinite area to the north and east and breaking out through the overburden at the bottom of the gulch and flowing down the gulch for some distance toward the Westfall Eighty. The spring was directly tributary to the stream.

"McIntyre Spring No. 2 is located directly east of McIntyre No. 1 about 500 feet distant in the third draw. It, too, is a contact spring of the same nature as Spring No. 1 and flowed directly into the water course in the draw and is tributary to that stream. The water from this spring, together with other waters, converged with the waters from gulches or draws Nos. 1 and 2 below the Westfall improvements. Springs Nos. 1 and 2 are each on the west side of their respective gulches.

"The Court further finds that prior to the entry of the South Half of the Southwest Quarter of said Section 18 McIntyre established a sheep camp on the North Half of said Quarter just below Spring No. 1. That he built a dam in the gulch about 400 feet below the spring, put in watering troughs, built a herder's shack and other improvements and for a number of years and until 1910 or 1911 used the land as headquarters for his sheep grazing business. That he ran upwards of 4000 sheep and the water from the spring was used for watering his sheep and other domestic purposes on said land.

"That, in 1919, Wm. M. Davis acquired the North Half of the Southwest Quarter of Section 18, together with the Southeast Quarter of said section and some adjoining land, and on January 18, 1936 conveyed said North Half of the Southwest Quarter of Section 18 to The Town of Genoa.

"That while McIntyre owned the land Spring No. 1

was curbed with railroad ties and, afterward, with cement, and the water, after McIntyre abandoned his sheep camp, was used by subsequent owners, including Davis, and by others grazing cattle in the vicinity or drifting livestock from one locality to another and by homesteaders for domestic purposes. While some of the use may have been compensated for to the owner by way of rent all use was permissive with no claim of right to the use of water being made by the users.

"The Court finds that there was no intent on the part of McIntyre or of his successors in interest to abandon the water right appropriated and used by McIntyre.

"The Court finds that after acquiring title to the North Half of the Southwest Quarter of said Section 18 and in 1937 the Town of Genoa began the construction of their Well No. 1. That the construction of Well No. 1 was directly over the site of McIntyre Spring No. 1. The construction consisted in digging a well or reservoir 18 feet deep, 25 feet in diameter, and extending downward into the shale approximately 8 feet, building a pump house and installing a four inch pump. The reservoir capacity of the well is 30,000 gallons. The water is then pumped directly into the 30,000 gallon Town standpipe and distributed to its water users through the Town water mains.

"The first full year of pumping was 1938. The well proved inadequate for the Town's needs. * * *

* * *

"In 1942 Well No. 2 was constructed about 160 feet southwest of Well No. 1. This well is 6 feet in diameter. Water from Well No. 2 is pumped into Well No. 1 for distribution.

"In 1947 Mr. Westfall claims to have first discovered a shortage in his water supply.

"From 1943 to 1947 Wells No. 1 and 2, as shown by the Town's meter readings, produced an average daily output of 7,116.7 gallons or 4.95 gallons per minute. * * *

* * *

"In 1951 Well No. 3 was constructed on the west side of draw number three about 500 feet east of Well No. 1. Well No. 3 was constructed on the exact site of McIntyre Springs No. 2 and in the same manner as Well No. 1. This well proved to be of little or no value, produced about 1,960 gallons per day or 1.33 gallons per minute, and could be pumped dry in about thirty minutes. It is not being used at the present time and consideration of this well may be dropped as the water intercepted in the spring flowed immediately into the draw which converges with the other draws below the Westfall improvements and did not contribute to the water supply at the house or other improvements.

"After the construction of Well No. 3 the Town, in 1951 or 1952, constructed Well No. 4 about 200 feet west of Well No. 1 on the same side of the draw but further up on the side of the bluff. In 1951 the annual average daily output fell to 4,441.5 gallons or 3 gallons per minute. In 1952, after Well No. 4 had been put into production, the annual average daily output was 6,270 gallons or 4.35 gallons per minute and in 1953, 7,011 gallons or 4.87 gallons per minute. The average daily output for June, July, and August during 1951, 1952 and 1953 was less than one gallon per minute in excess of the annual daily average.

"That it is impossible to state accurately the amount of water intercepted and diverted by the Town. The largest amount intercepted was in 1949 when 3,132,500 gallons or a daily average of 8,582.2 or 5.96 gallons per minute was intercepted. The smallest amount was in 1951 when 1,621,150 gallons or a daily average of 4,441.5 or 3 gallons per minute was intercepted.

"Taking the larger amount as representing the amount intercepted and diverted and assuming the population of the Town of Genoa to be approximately 200, consisting of 50 family water users, the consumption of water per family for domestic purposes would be 5220 gallons or 174 gallons per day.

"The Court finds that all water intercepted has been diverted from the place of original use and used outside of the watershed in which the Westfall improvements are located.

"The Court finds that the Town of Genoa is entirely dependent upon these wells for its water supply; that it has no other source nor is any other available.

## "THE PLAINTIFF'S CLAIM TO WATER

"The Court finds that in October, 1933, George E. Nolan obtained a U. S. Patent to the South Half of the Southwest Quarter and the Southeast Quarter of Section 18, Township 9 South, Range 54 West of the 6th P.M. in Lincoln County, Colorado. He built a small house and some improvements where the Westfall improvements are now located. There was a natural pond in the curve of the draw 75 feet or so above the present sump, and a smaller pond immediately below the sump. Between the ponds the ground was swampy or boggy and springy underfoot. Water coming down the draws would pass through the first pond, over or through the bog into the lower pond and, running out, would disappear in the sand south of the lower pond.

"Water from the McIntyre Spring No. 1 flowed directly into the draw which was about 1800 feet above the ponds above mentioned.

"There were other natural ponds or potholes in the pastures.

"Mr. Nolan dug a well 8 feet deep on the west bank of the north pond and put a pump in the well. The well water was used for household purposes. The stock (and he had about 40 head of cattle and some horses) watered at the ponds or potholes. The upper pond has been referred to in plaintiff's testimony as Spring No. 1 and the lower pond as Spring No. 3 and the sump dug out in 1924 as Spring No. 2. These natural ponds were filled by water running down the draws and, after the surface flow had ceased, would remain full and even overflow

for some time — doubtless being replenished from underflow.

"Mr. Nolan sold out in 1917 and left the place in 1918. During the time he resided there he claimed to have had no shortage of water either before or after McIntyre ceased operations of his sheep business.

"From March, 1922 to September, 1927, before her marriage, Mrs. Howe lived on the Nolan Homestead with her father, a Mr. Larson, a tenant, and other members of the family. Mr. Larson kept about 16 head of cattle, from 15 to 25 head of horses, 8 to 16 head of hogs, and some poultry. The stock watered at the natural ponds; the well furnished water for the house.

"Wm. B. Jones became the owner of the South Half of the Southwest Quarter of Section 18 and the West Half of Section 19 in October, 1923 and Mr. Larson continued as his tenant. In 1924 the upper pond and the well went dry and, in 1924, the tenant dug the sump in the narrow neck of land between the corrals and the garden plot and very close to the stream bed. This sump was rectangular in form, about 2½ feet wide, 4½ feet long, and 3 or 4 feet deep and curbed with cement. Jones furnished the materials and the tenant did the work.

"Water rose in the sump and, in the spring of the year and in wet seasons, would flow through an overflow pipe and into a box or trough for the horses. Water was dipped from the sump with a bucket for household use. Below the sump a fill was put in the draw to provide a crossing to farm land east of the draw. This formed a pond that was used for stock water as well as the pond below the sump. Mr. Westfall later raised this fill and put in a tube to prevent water from passing over the fill.

"Mr. and Mrs. Howe resided on the place as tenants from 1928 to 1932. They had 6 cows, 6 horses, 2 sows, and pigs and some chickens. There was water for what stock they had and for household purposes. Water didn't flow from the sump in the winter or in dry sea-

sons. No. 1 pond was dry. The ponds were filled by flood water and no water flowed from the spring (sump) except a trickle in the spring and wet weather.

"That, in 1932 Westfall leased the South Half of the Southwest Quarter of said Section 18 together with other land totaling in all 1040 acres and brought to and kept on the ranch 100 head of cattle, 10 to 15 hogs and a few horses. In 1946 he purchased the ranch from Wm. B. Jones and since then he has further increased his holdings until since 1951 his total acreage has been 7,360 acres. He has steadily increased his livestock from 100 in 1932 to 533 neat cattle and 11 horses in 1948. Since 1948 and to and including 1953 he has had and kept a yearly average of 376 neat cattle and 7 horses.

"Mr. Westfall made no change in the existing water facilities at the improvements except to deepen the sump and to install a pump and stock tank and to clean out the ponds below the sump.

"The Court finds that at no time was there any considerable flow of water from the sump and that before the installation of the pump water was dipped or drawn from the sump with a bucket.

"The Court finds that the sources of water upon which Mr. Westfall depended for domestic use at his ranch improvements are as follows: 1. Surface flow from precipitation in the form of rain and snow falling on the watershed above his ranch property. 2. Percolating water from precipitation on the watershed. 3. Percolating waters from McIntyre Spring No. 1 not intercepted by the Town wells and probably other waters from the top of the Pierre shale percolating into the overburden near the top of the bluffs but not in sufficient quantities to break through as springs. And, 4, Water intercepted by the Town in McIntyre Spring No. 1. All of these waters, finding their way into the gulches, flow down either as surface or underflow or both to and through the Westfall improvements and supply water to the three Westfall 'springs.'

"These 'springs' are really potholes or ponds in the bed of the stream, the sump being an artificial one. All obtain water from the surface and sub-surface flow of the stream. If there is any water entering from any other source it is percolating water arriving at the stream.

"The Court finds that the water from the McIntyre Spring No. 1 is a visible and constant source of the Westfall water supply and when augmented by precipitation and probable percolation of water from other sources would contribute to the supply of water for domestic purposes at his improvements. That the interception and diversion of six gallons per minute at the McIntyre No. 1 Spring without augmentation would not reach the Westfall improvements in any appreciable amount but, with such augmentation, would supply the ranch with sufficient water for household and other domestic uses such as was enjoyed prior to the diversion by the Town. That the plaintiff has suffered damages by reason of the interception and diversion of water from McIntyre Spring No. 1 by the defendant thereby depriving him of a constant supply of water for domestic use at his ranch improvements. That no evidence was introduced or competent evidence offered as to such damages. That, except for water at the improvements, the plaintiff's ranch is well watered and has ample without water from the McIntyre Springs.

"The Court finds that if a maximum of 7750 gallons of water per month is furnished and delivered at the Westfall improvements at the rate of 250 gallons per day the plaintiff will have and enjoy a water supply for domestic use equal to that which he had before the interception and diversion of water from the McIntyre Springs by the defendant.

"CONCLUSIONS OF LAW

"THE COURT FINDS:

"1. That the waters of the McIntyre Springs flow directly into gulches or draws which are streams within

the meaning of the statute and are tributary to the Big Sandy and Arkansas Rivers.

"2. That the so-called springs from which the plaintiff claims his rights are in the bed of such stream, are a part thereof and hence tributary to the Big Sandy and Arkansas Rivers.

"3. That the streams into which said McIntyre Springs flow and the stream of which the Westfall 'springs' are a part are intermittent and waters flowing therein eventually reach the Big Sandy and Arkansas Rivers.

"4. That the original diversion works of the plaintiff and of the defendant are similar in character and construction and are sufficient to constitute a diversion to support an appropriation. That water has been appropriated for domestic purposes by both parties or their predecessors in interest and has been put to beneficial use.

"5. That the defendant has, without right and to the damage of the plaintiff, changed the point of application or use of water from the North Half of the Southwest Quarter of Section 18, Township 9 South, Range 54 West of the 6th P.M. to the Town of Genoa, a mile and a half distant, and from a watershed common to both plaintiff and defendant.

"6. That the plaintiff has suffered damage by reason of the wrongful acts of the defendant and is entitled to equitable relief.

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:

"1. That within ninety days from the date of this order or within such time as said date be extended, the defendant, The Town of Genoa, deliver or make available for delivery to the plaintiff, Gilbert O. Westfall, and to his heirs, devisees and assigns at a point at or within 200 feet west of the present Westfall sump to be selected by said Town or at such place as may be agreed upon by the parties, 250 gallons of water per day not to ex-

ceed 7750 gallons in any one month. The water so delivered each month in any amount, but not exceeding 7750 gallons, shall be delivered free of charge and shall be used, without waste, only for household and other domestic uses on the Westfall Ranch. While the Town of Genoa is not required to furnish more than 7750 gallons of water per month, any excess furnished shall be paid for by the plaintiff at the usual Town water rates or at a price to be agreed upon by the parties, and such excess shall be subject to such general regulations and restrictions as to the use of water as may be imposed by the Town or the agreement of parties.

"The water above mentioned shall be furnished and delivered only from the present source of the Town of Genoa's supply on the North Half of the Southwest Quarter of Section 18, Township 9 South, Range 54 West of the 6th P.M., being the waters intercepted in McIntyre Spring No. 1 and by the present Town wells. Should the Town abandon said wells or cease intercepting and diverting said waters, this order shall be null and void, otherwise said order to be and remain in full force and effect and, upon failure of the Town of Genoa to comply therewith, said town shall cease and desist from intercepting and diverting said water and is hereby enjoined from further pumping any and all of said wells. * * * ."

We have examined the record on error which consists of two large bound volumes, and conclude that there is competent evidence to sustain all of the findings of fact made by the trial court. The conclusions of law entered by the trial court are challenged on numerous grounds. We find it necessary to mention only those made apparent by the questions hereinafter set forth.

Questions to be Determined.

First. *Did the district court of Lincoln county exceed its jurisdiction in entering the judgment in this action for the reason that jurisdiction to adjudicate water rights and priorities in Water District No. 67, Division No. 2,*

*which includes the area in dispute, is in the district court of Bent county?*

█ This question is answered in the negative. This action involved only the relative rights of the parties to the action. It was not in any sense a general water adjudication proceeding over which the district court of Bent county has jurisdiction. The district courts in the several counties have general jurisdiction to determine disputes involving the use of water which may arise between residents of any community. One is not required to resort to the particular court authorized to conduct a general adjudication proceeding in the several water districts in order to secure redress in an action involving an alleged infringement of a right to the use of water. *Black, et al. v. Taylor, et al.,* 128 Colo. 449, 264 P. (2d) 502; *Safranek, et al. v. Town of Limon,* 123 Colo. 330, 228 P. (2d) 975; *Karl F. Hehl Engineering Co. Inc. v. Harold Hubbell,* 132 Colo. 96, 285 P. (2d) 593.

Second. *Did the use of water by Westfall and his predecessors in interest amount to an "appropriation of water to beneficial use" as that phrase is understood in the water law of Colorado?*

█ This question is answered in the affirmative. It is contended by counsel for the town that the use of water made by Westfall was nothing more than the exercise by him of the right under the "old common law doctrine giving the riparian owner a right to the flow of water in its natural channel upon and over his lands, even though he makes no beneficial use of it." The argument is without merit.

"The true test of the appropriation of water is the successful application thereof to the beneficial use designed, and the method of distributing or carrying the same, or making such application, is immaterial." *Thomas v. Guiraud, et al.,* 6 Colo. 530. *Fort Morgan Land & Canal Co. v. Ditch Co.,* 18 Colo. 1, 30 Pac. 1032. In upholding the validity of an appropriation of water where no extensive mechanical devises were used to accomplish a

"diversion of water" the Supreme Court of Nevada in *Steptoe Livestock Co. v. Gulley,* 53 Nev. 163, 295 Pac. 772, said, inter alia:

" * * * that for more than forty years last past the plaintiff and its predecessors in interest have had and now have a subsisting right to water in excess of 500 head of livestock at and upon the water courses in question, and have watered their livestock in sufficient numbers to utilize substantially all that portion of the public range available to livestock watering at such places; *that said watering places on said water courses are natural watering places formed by natural depressions and by the making of cattle trails into such particular watering places on said water courses;* that said watering places on said water courses could not have been and could not be improved by the construction of dams, ditches, pipe lines, troughs, or other artificial means; that the use of said waters and range by such livestock of the plaintiff and its predecessors during said period was exclusive, except as to other livestock that would drift or stray in." (Emphasis supplied.)

It is not necessary in every case for an appropriator of water to construct ditches or artificial ways through which the water might be taken from the stream in order that a valid appropriation be made. The only indispensable requirements are that the appropriator intends to use the waters for a beneficial purpose and actually applies them to that use.

Third. *Did the town acquire exclusive right to the water produced at its several wells on the theory that said waters were not tributary to any natural stream?*

This question is answered in the negative. The trial court found that the waters in question were tributary waters and as such subject to appropriation. There was evidence to support this finding. The burden was upon the town to prove the contrary, which it did not do. From *Safranek v. Limon,* supra, we quote the following:

" * * * Under our Colorado law, it is the presumption

that all ground water so situated finds its way to the stream in the watershed of which it lies, is tributary thereto, and subject to appropriation as part of the waters of the stream."

Counsel for Westfall summarize the factual situation in the following way:

" * * * During the pioneer days one McIntyre, who owned the adjoining eighty now owned by Genoa had springs on his lands the water of which was used for sheep. Much of this water found its way to Nolan's land where it was used by him for domestic purposes and watering his cattle and livestock. During these early days there was no question as between these two neighbors of their respective rights for no infringement was made by either of them upon the other. In 1938 (sic) [1936] the Town of Genoa, having heard of the rumors of this spring, conceived the thought that they would buy this land and get the use of all the water, relying on the old English law theory that whoever owns the land owns all the water. In 1936 they drilled the first well with about a dozen tubes running outside into the ground, intending thereby to capture all of the water regardless of what the results might be to Westfall, in 1942 they drilled Well No. 2. Later on Well No. 3 was drilled and in 1951 Well No. 4 was drilled. However, they were not satisfied with drilling the four wells for the Town, shortly after the construction of the first well, decided to build a sort of dam, retaining wall from the well. They thought that by constructing such a wall they would certainly stop the flow of any ground water that might reach Westfall. The witness, Nuss, Town Clerk, testified:

" 'The wing or wall on Well No. 1 which was put in, running from the well southwest to the wall in 1938 (1607) and the Town had been using all of the water from the lands for domestic purposes, lawn sprinkling and washing cars.'

"The testimony of the experts clearly indicate that

by these four wells and the retaining wall, the Town had done 'a good job' in capturing the Westfall water. Certainly the Town expended sums of money but quite evidently they did not feel Westfall should be compensated for what they were doing to him in depriving him of the water which was used in connection with his improvements and served as a source of livlihood to him."

In order for the town to acquire the water diverted from the Westfall eighty in a legal manner, on the basis of its right to do so for domestic purposes, it could have taken steps by eminent domain proceedings to condemn the water, which would necessarily involve payment of compensation to Westfall. *Town of Sterling v. Pawnee D. E. Co.*, 42 Colo. 421, 94 Pac. 339; *Luxen v. Town of Rifle, et al.*, 100 Colo. 540, 69 P. (2d) 251.

Under the facts in the instant case Westfall had the right to continued maintenance of conditions as they existed at the time the appropriation of water was made for use on the eighty acres now owned by him. *Mendenhall v. Lake Meredith Reservoir Co., et al.*, 127 Colo. 444, 257 P. (2d) 414. In many respects the instant case is similar to the situation presented to this court in *Black, et al. v. Taylor, et al.*, supra, and the principles of law there applied are equally applicable here. We are not impressed with the argument presented by counsel for Westfall in support of his cross assignments of error.

The judgment is affirmed.

MR. CHIEF JUSTICE SUTTON and MR. JUSTICE FRANTZ concur.