The THREE BELLS RANCH ASSOCIATES and Sterling Sand & Gravel Company, A Colorado Corporation, Appellants–Defendants,

v.

CACHE LA POUDRE WATER USERS ASSOCIATION; Cache La Poudre Reservoir Company; The New Cache La Poudre Irrigation Company; The Ogilvy Ditch Company; and The North Side Lateral Ditch Company, Appellees–Plaintiffs,

and

Jeris Danielson, State Engineer, State of Colorado, and James Clark, Division Engineer, Water Division No. 1, State of Colorado, Appellees–Defendants.

No. 86SA37.

Supreme Court of Colorado, En Banc.

May 23, 1988.

Caplan & Earnest, Gerald A. Caplan, Richard E. Bump, Boulder, Bratton and Associates, L. Richard Bratton, Gunnison, for appellants-defendants.

Fischer, Brown, Huddleson & Gunn, William H. Brown, Fort Collins, for appellees-plaintiffs.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Sherry A. Caloia, Peggy M. Ventura, Asst. Attys. Gen., Denver, for appellees-defendants.

LOHR, Justice.

This case arises out of a conflict between the operators of a gravel quarry and water users on the over-appropriated Cache La Poudre River. The conflict concerns the responsibility of the quarry operators to make advance provisions to compensate for the water that will be lost by evaporation when the gravel removal operations are completed and ponds of ground water remain in the gravel pits as part of a reclamation plan. The plaintiff water users obtained a declaratory judgment against the quarry operators in the District Court for Water Division No. 1. The court held that the reclamation of the mined property by the creation of lakes or ponds caused by digging gravel pits to depths below the water table will constitute an appropriation of water as defined in section 37–92–103(3)(a), 15 C.R.S. (1987 Supp.), and that the gravel pits will be wells, as defined in section 37–90–103(21), 15 C.R.S. (1973). As a result, the operators will be required to obtain well permits from the state engineer, which in turn will require that they adopt a plan for augmentation to compensate for any injury that will be caused to owners of senior water rights by the gravel removal and reclamation activities. The water users are principally concerned about the evaporative losses that will occur from the surface of the ponds. The quarry operators appealed, contending that the issues are not appropriate for resolution by declaratory judgment at this time and that the district court erred in its resolution of each of the questions presented. We conclude that the district court was correct in all respects and therefore affirm the judgment.

I.

In 1979, The Three Bells Ranch Associates, a partnership (Three Bells), applied for and subsequently obtained a mining and reclamation permit from the Mined Land Reclamation Board of the State of Colorado to conduct a gravel mining operation on lands near the Cache La Poudre River in Larimer County. See Colorado Mined Land Reclamation Act, §§ 34–32–101 to –126, 14 C.R.S. (1984 & 1987 Supp.) (Mined Land Reclamation Act). The application included a reclamation plan involving the creation of lakes by the flow of tributary ground water into the gravel pits as a result of extending the excavations below the level of the water table in the alluvium of the Cache La Poudre River. According to the application, the lakes are to be used for recreational purposes and will provide fishing areas and additional wildlife habitat. It was estimated that the mining operation would continue for at least fif-

teen years, and reclamation was to be an ongoing activity concurrent with mining.[1]

In 1980, plaintiffs Cache La Poudre Water Users Association, Cache La Poudre Reservoir Company, The New Cache La Poudre Irrigation Company, The Ogilvy Ditch Company, and The North Side Lateral Ditch Company (collectively, the "water users")[2] brought an action for declaratory judgment under C.R.C.P. 57 against Three Bells[3] in the District Court for Water Division No. 1 (district court). Also named as defendants were the state engineer and the division engineer for water division no. 1. As the litigation progressed, however, the state and division engineers supported the position of the water users.

The water users' complaint alleged that Three Bells intended to appropriate water for recreational purposes by excavating pits adjacent to the Cache La Poudre River. The pits would become filled with water from the river and its connected alluvial aquifer and could then be used for recreational and other beneficial purposes. This activity, it was alleged, would injure the water users and other appropriators on the river. The water users sought a determination that the excavation of such a pit would constitute the construction of a "well" as defined in section 37–90–103(21), and that such construction can occur only if a permit is obtained from the state engineer under the Colorado Ground Water Management Act, §§ 37–90–101 to --142, 15 C.R.S. (1973 & 1987 Supp.) (Ground Water Management Act). The water users also asked that the court decree that the intended actions of Three Bells would constitute an attempted or intended appropriation of water. Other relief requested included a determination that Three Bells could use the water only in accordance with the doctrine of priority of appropriation.

The district court held a hearing limited to the issues of whether Three Bells' proposed activities would effect an appropriation and whether the gravel pits would be wells. The issue of injury to the water users was not included among the matters to be resolved at the hearing. On September 23, 1982, *nunc pro tunc* November 10, 1981, the district court found that the plan for reclamation involved the creation of lakes for recreational purposes, and concluded that this "would be an application of the waters of the state to a beneficial use." The court then decreed that "[t]he proposed activities of [Three Bells] pertaining to reclamation of the mined property will constitute an appropriation of water" and that "[t]he pits, since they will obtain ground water for beneficial use from an aquifer, will be wells." The order provided that this was not a final judgment, and the plaintiff water users later moved to dismiss their other claims and to make the judgment final. The district court granted the dismissal on November 14, 1984, and determined that the September 23, 1982, order would become a final judgment unless

---

**1.** The application specifies that during the mining process water from the pits will be pumped from de-watering trenches and discharged into the Cache La Poudre River. A desirable water level in lakes previously mined will be achieved by a series of interconnected underground water lines.

**2.** The plaintiffs represent water users and appropriators on the Cache La Poudre River. The Cache La Poudre Water Users Association is a nonprofit organization set up to help protect and administer the water rights on the river. Its membership includes practically all of the ditch companies that divert water from the river and includes the cities of Fort Collins and Greeley. All of the named plaintiffs except The North Side Lateral Ditch Company, a mutual ditch and irrigation company, are members of the Association.

**3.** The Mined Land Reclamation Board of the State of Colorado was also named as a defendant but was dismissed on motion early in the litigation. By an amended complaint The Poudre Valley Farm Partnership, purchaser of the property from Three Bells, was added as a defendant. However, Sterling Sand & Gravel Company, the operator of the sand and gravel mine through a lease from The Poudre Valley Farm Partnership, was subsequently substituted for Poudre Valley as the real party in interest. The mining permit obtained from the Mined Land Reclamation Board by Three Bells has been assigned to Sterling Sand & Gravel. Sterling Sand & Gravel Company is a Colorado corporation and is a partner in both The Three Bells Ranch Associates and The Poudre Valley Farm Partnership. For simplicity, we refer to the owners and operators of the gravel pit collectively as "Three Bells."

Three Bells filed additional claims or applications in the case within thirty days.

While the litigation was in progress, Three Bells commenced gravel mining operations. On November 2, 1984, the division engineer issued an order pursuant to section 37–92–502, 15 C.R.S. (1987 Supp.), directing Three Bells to cease diversions or removal of water from the gravel pit. Within ten days, Three Bells was required to submit to the state engineer a well permit application for the gravel pit as well as evidence of a plan of substitute supply pursuant to section 37–80–120, 15 C.R.S. (1973), in order to protect other water users from injury while Three Bells attempted to obtain judicial approval of a plan for augmentation.[4] The order also required that an application for approval of a plan for augmentation be filed in the district court within sixty days.

Three Bells complied with the requirements to submit a well permit application and a plan of substitute supply. The quarry operators filed an additional pleading in the present case on December 13, 1984, seeking injunctive relief against the state engineer and the division engineer to restrain them from enforcing the November 2, 1984, cease and desist order. The pleading also requested approval of a plan for augmentation to compensate for water consumption during mining operations, but asked that adoption of any plan for augmentation relating to post-mining evaporative losses be deferred until after water is accumulated in the lakes as part of the reclamation project. Three Bells indicated in this pleading that it was filed within thirty days of the court's November 14, 1984, determination in order to prevent the September 23, 1982, judgment from becoming final.

In January 1985 the water users renewed their motion to make the September 23,

1982, declaratory judgment order final. On June 28, 1985, the district court granted that motion, under C.R.C.P. 54(b), and this appeal followed. The issues before us are limited to whether declaratory judgment was appropriate, and whether the district court was correct in determining that Three Bells' reclamation activities will effect an appropriation and that the gravel pits to be excavated will be wells.

## II.

We begin with an analysis of the appropriateness of declaratory judgment. Three Bells contends that the declaratory judgment issued in this case pursuant to C.R.C.P. 57 was not proper because the district court was requested to issue an advisory opinion rather than to resolve an actual controversy. It is true that declaratory judgment is not available simply for advisory purposes when no real controversy exists. *Beacom v. Board of County Comm'rs*, 657 P.2d 440, 447 (Colo.1983); *Farmers Elevator Co. of Sterling v. First Nat'l Bank of Fleming*, 176 Colo. 168, 171, 489 P.2d 318, 319 (1971). The legal controversy presented must be a current one rather than one that may arise at some future time. *See Heron v. City & County of Denver*, 159 Colo. 314, 316, 411 P.2d 314, 315 (1966) (declaratory judgment proceeding not available for challenge of building permit ordinance when plaintiff had not applied for a permit; "there must be a justiciable issue or a legal controversy extant, and not a mere possibility that at some future time such a question may arise"); *McDonald's Corp. v. Rocky Mountain McDonald's, Inc.*, 42 Colo.App. 143, 590 P.2d 519 (1979) (determination of corporate good standing not ripe for declaratory judgment when good standing at a specified future date was the fact relevant to the dispute); *Utah Int'l v. Board of Land Comm'rs*, 41 Colo.App. 72, 579 P.2d 96

---

**4.** As defined in section 37–92–103(9), 15 C.R.S. (1987 Supp.), a plan for augmentation is "a detailed program to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternative means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of wa-

ter, by the development of new sources of water, or by any other appropriate means." Pursuant to section 37–92–302, 15 C.R.S. (1987 Supp.), an application for approval of a plan for augmentation must be filed with the water court. Those opposing the augmentation plan may file statements of opposition explaining why the application for approval should not be granted.

(1978) (when the State of Utah had no present intent to mine under its mineral rights lease, it could not obtain declaratory judgment determining mineral ownership under a right-of-way affecting the leased lands). The case before us, however, involves a real and current controversy.

If, as Three Bells contends, the gravel pits will not constitute wells, Three Bells need not obtain well permits under section 37–90–137, 15 C.R.S. (1973 & 1987 Supp.), and need not make provision for augmentation as part of the well permit process. If on the other hand the gravel pits will be wells, the well permit process is applicable and before the permits are issued and the wells are dug the state engineer must be satisfied that no material injury will result to the owners of senior water rights. § 37–90–137.[5] Thus, the determination of whether the pits will be wells has important legal consequences at this time, and as part of this determination, the issues of appropriation and beneficial use must also be considered. As the water users assert, they will be injured if the gravel pits are excavated. Even though the injury will not occur until reclamation activity begins, injury to senior water users is inevitable once a gravel pit is dug to a depth below the water table under a plan utilizing ponds as part of the plan for reclamation. Indeed, once the pits are dug, the only effective way to curtail evaporation from the ponds is to fill in the pits.

Three Bells argues that plans may change and that it is not at all certain that lakes will be utilized in the reclamation plan. It is true that a reclamation plan may be amended if circumstances change in the course of the gravel extraction. § 34–32–116(1)(a), (k), 14 C.R.S. (1984). Three Bells, however, obtained its mining and reclamation permit on the basis of its application containing a specific reclamation plan involving the creation of lakes.

Pursuant to the Mined Land Reclamation Act, a permit that includes a reclamation plan is necessary before mining operations may begin. Although the reclamation plans may change, we believe that for purposes of this proceeding we must assume that the reclamation plan will be implemented in the manner represented in the application. Three Bells has not amended its reclamation plan, and a Three Bells representative suggested in his testimony that it would not be economically feasible to reclaim the land by completely filling in all the pits.

Under C.R.C.P. 57(b) "[a]ny person ... whose rights, status, or other legal relations are affected by a statute, ... may have determined any question of construction ... arising under the ... statute, ... and obtain a declaration of rights, status, or other legal relations thereunder." *See also* §§ 13–51–101 to –115, 6A C.R.S. (1987) (Uniform Declaratory Judgments Law). This rule addresses precisely the situation presented in this case, and declaratory judgment is an appropriate remedy.

### III.

The Colorado Constitution declares that the unappropriated water of every natural stream in Colorado is the property of the public, Colo. Const. art. XVI, § 5, and further guarantees the right to divert these unappropriated waters and apply them to beneficial use, Colo. Const. art. XVI, § 6. Water rights created by appropriation are property rights and are protected as such. *E.g., Navajo Development Co., Inc. v. Sanderson*, 655 P.2d 1374, 1377 (Colo.1982); *Colorado Springs v. Yust*, 126 Colo. 289, 293, 249 P.2d 151, 153 (1952). The waters of natural streams subject to appropriation include not only the surface flows but all underground water tributary thereto.[6] *Pikes Peak Golf*

---

**5.** *See also* Amended Rules and Regulations of the State Engineer for the South Platte River (1974). Rule 2 requires that ground water diversions be curtailed unless the division engineer finds that the "well is operating pursuant to a decreed plan of augmentation" or that "the ground water appropriation can be operated under its priority without impairing the water

supply to which a senior appropriator is entitled."

**6.** Ground water, or underground water, is presumed to be tributary to a natural stream. *Town of Genoa v. Westfall*, 141 Colo. 533, 547–48, 349 P.2d 370, 378 (1960); *Safranek v. Town of Limon*, 123 Colo. 330, 334, 228 P.2d 975, 977

*Club, Inc. v. Kuiper,* 169 Colo. 309, 314, 455 P.2d 882, 884 (1969); *Whitten v. Coit,* 153 Colo. 157, 164–65, 385 P.2d 131, 135–36 (1963). As knowledge of the science of hydrology has advanced, it has become clear that natural streams are simply the surface manifestations of extensive tributary systems including underground water in stream basins. *R.J.A., Inc. v. Water Users Ass'n,* 690 P.2d 823, 826 (Colo.1984); *Fellhauer v. People,* 167 Colo. 320, 338, 447 P.2d 986, 995 (1968). As a result of this interconnection, wells withdrawing tributary water can affect the flow of a surface stream. *In re Rules and Regulations Governing Use, Control and Protection of Water Rights,* 674 P.2d 914, 928 (Colo.1983); *Fellhauer v. People,* 167 Colo. at 331–32, 447 P.2d at 992. In order to integrate the use of tributary ground water with the use of surface water so as to maximize the beneficial use of all Colorado waters, the General Assembly adopted the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602, 15 C.R.S. (1973 & 1987 Supp.) (1969 Act).[7] *See* § 37–92–102(1), 15 C.R.S. (1987 Supp.); *State v. Southwestern Colorado Water Conservation Dist.,* 671 P.2d 1294, 1308–09 (Colo.1983), *cert. denied,* 466 U.S. 944, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984); *State ex rel. Danielson v. Vickroy,* 627 P.2d 752, 757–58 (Colo.1981). The 1969 Act provides for the adjudication and administration of tributary water under a system of priorities, implementing the constitutionally based right of prior appropriation. *R.J.A.,*

*Inc. v. Water Users Ass'n,* 690 P.2d at 825; *State v. Southwestern Colorado Water Conservation Dist.,* 671 P.2d at 1308–09.

Priority of appropriation is the dominating principle by which conflicting claims to use of tributary water have been resolved.[8] In situations where a junior right cannot be exercised without injury to a senior right, we have required the injury to be eliminated by imposing conditions on the exercise of the junior right. *See, e.g., Weibert v. Rothe Bros.,* 200 Colo. 310, 618 P.2d 1367 (1980); *Kelly Ranch v. Southeastern Colorado Water Conservancy Dist.,* 191 Colo. 65, 550 P.2d 297 (1976). Our prior cases have involved competing claims by persons owning or seeking to acquire and preserve water rights. The present case is different in that Three Bells disavows any wish to obtain a water right.

Three Bells asserts that it is interested only in mining sand and gravel, that the water encountered in the mining operation is a nuisance, and that any injury to senior water users resulting from post-mining evaporation is a necessary incident of the mining for which Three Bells need not provide compensation. Specifically, Three Bells asserts that its activities are governed exclusively by the Mined Land Reclamation Act, and that the legislature did not intend that mining and reclamation activities conducted thereunder should be subject to requirements to compensate for loss that such activities might cause to a stream. Additionally, it asserts that the

(1951). Tributary underground water is "that water in the unconsolidated alluvial aquifer of sand, gravel, and other sedimentary materials, and all other waters hydraulically connected thereto which can influence the rate or direction of movement of the water in that alluvial aquifer or natural stream." § 37–92–103(11), 15 C.R.S. (1973). Tributary underground water does not include "ground water which in its natural course would not be available to and required for the fulfillment of decreed surface rights" and which "is within the geographic boundaries of a designated ground water basin." *See* § 37–90–103(6)(a), 15 C.R.S. (1987 Supp.).

7. Regulation of wells appropriating tributary ground water involves both the 1969 Act and the Ground Water Management Act. Section 37–90–137 of the Ground Water Management Act sets forth the procedures for obtaining a well

permit for water outside designated ground water basins, including tributary ground water. The 1969 Act contains general principles relating to the administration of water rights and the development and approval of plans for augmentation.

8. In adhering to this principle we have rejected attempts to create water rights independent of the priority system by reducing the quantity of water lost to the stream system through evaporation. *See Southeastern Colorado Water Conservancy District v. Shelton Farms, Inc.,* 187 Colo. 181, 529 P.2d 1321 (1975) (cutting phreatophytes to reduce evaporative loss); *R.J.A., Inc. v. Water Users Ass'n,* 690 P.2d 823 (Colo.1984) (eliminating peat bog for same purpose); *Giffen v. State,* 690 P.2d 1244 (Colo.1984) (cutting trees for same purpose).

trial court erred in concluding that the reclamation plan would result in an "appropriation" and that a sand and gravel pit would constitute a "well" so as to subject the mining activities to scrutiny and regulation under the 1969 Act and the Ground Water Management Act. These issues take on particular importance because it is recognized that the Cache La Poudre River is over-appropriated,[9] *Cache La Poudre Water Users Ass'n v. Glacier View Meadows*, 191 Colo. 53, 58, 550 P.2d 288, 292 (1976), as is the South Platte River, to which it is tributary. *Wadsworth v. Kuiper*, 193 Colo. 95, 98, 562 P.2d 1114, 1115 (1977).

We conclude that the Mined Land Reclamation Act was not intended to exempt mining and reclamation activities from the statutes governing the appropriation and administration of water and that the trial court correctly concluded that Three Bells' reclamation activities will effect an appropriation of water and that the sand and gravel pits will be wells. We consider first the effect of the Mined Land Reclamation Act and then address whether Three Bells' activities will result in an "appropriation" and the construction of "wells."

## A.

■ Three Bells argues that because the legislature has adopted the Mined Land Reclamation Act, which outlines the procedures that must be followed to secure a mining permit, the requirements of that act are comprehensive and demonstrate an intent that the well permit requirements of the Ground Water Management Act should not apply. It asserts that the legislature considered the impact of mining on water rights and addressed this issue in section 34-32-116(1)(h), 14 C.R.S. (1984), which requires that mining operators minimize "[d]isturbances to the prevailing hydrologic balance of the affected land and of the surrounding area and to the quality and quantity of water in surface and ground water systems both during and after the mining operation and during reclamation."

In reaching this conclusion, Three Bells relies in part on the legislative declaration that the state's commercial mineral deposits, including sand, gravel and quarry aggregate are essential to Colorado's economy, §§ 34-1-301 to -302, 14 C.R.S. (1984), and the prohibition of local government interference with excavation of these resources through zoning or other mechanisms. § 34-1-305, 14 C.R.S. (1984). In addition, the Mined Land Reclamation Act provides that extraction of these minerals is a necessary and proper activity that is compatible with land reclamation. § 34-32-102, 14 C.R.S. (1984).

■ We find nothing in these statutory provisions that reflects a legislative intent to preempt the requirements of the Ground Water Management Act or the 1969 Act. Colorado's doctrine of prior appropriation has roots in our constitution, and it has provided the basis for development of an elaborate system of water rights and priorities—rights that constitute property interests. Absent explicit provisions in the Mined Land Reclamation Act—and we discover none—we will not assume that the General Assembly intended to authorize mining activities that are not subject to scrutiny under the Ground Water Management Act or the 1969 Act. Instead, we believe that when mining operations affect water rights it is necessary for the operator to achieve compliance with the Ground Water Management Act and the 1969 Act as well as the Mined Land Reclamation Act. The rules promulgated under the Mined Land Reclamation Act confirm our reading of the Act. Rule 6.2(a), 2 C.C.R. 407-1 (1978) provides in pertinent part that:

> [d]isturbances to the prevailing hydrologic balance of the affected land and of the surrounding area and to the quantity of water in surface and groundwater systems both during and after the mining operation and during reclamation shall be minimized by measures such as:

---

9. When a stream is over-appropriated, there is not enough water available to satisfy the needs of all of the decreed appropriators. *See Hall v. Kuiper*, 181 Colo. 130, 132, 510 P.2d 329, 330 (1973) (a river is over-appropriated when "in the irrigation season, except during storm and flood times, there is not enough water ... to satisfy all of the decreed surface appropriations").

1. Compliance with applicable Colorado water laws and regulations governing injury to existing water rights....

▮▮▮ Three Bells also points out that the state engineer in office from 1969 through 1979 interpreted the water law as not requiring gravel excavators to furnish replacement water for evaporative losses.[10] Three Bells reminds us that courts should accord deference to the construction of a statute by administrative officials charged with its enforcement. *See, e.g., Ingram v. Cooper,* 698 P.2d 1314, 1316 (Colo.1985); *Travelers Indemnity Co. v. Barnes,* 191 Colo. 278, 282, 552 P.2d 300, 303 (1976). However, the present administrator's position differs from that of the previous state engineer, and when the construction of a statute by those charged with its administration has not been uniform, we need not extend such deference. *See, e.g., Colorado Common Cause v. Meyer,* 758 P.2d 153, 159 (Colo.1988). In addition, we need not defer to administrative interpretation when, as in this case, the statutory language is so clear as to compel the contrary result.

Finally, Three Bells calls to our attention legislation that was proposed but not adopted in 1973 to impose on excavators the burden of making up evaporative losses. *See* Colo. House Bill 1467, 49th General Assembly, First Session (1973). In turn, the water users refer to a later legislative proposal that also proved unsuccessful and would have removed gravel pits from the statutory definition of a well. *See* Colo. House Bill 1560, 54th General Assembly, First Session (1983). In construing statutory language, legislative intent should be ascertained and given effect. *See, e.g., People v. District Court,* 713 P.2d 918, 921 (Colo.1986); *People v. Stevens,* 183 Colo. 399, 408, 517 P.2d 1336, 1340 (1973). The legislative history of a statute, including successive drafts of a bill, *Haines v. Colorado State Personnel Board,* 39 Colo.App. 459, 566 P.2d 1088 (1977), may prove helpful in determining the legislative intent; however, later unsuccessful attempts to modify section 37–90–137 provide no guidance as to the legislature's intent in adopting that provision. *See, e.g., Colorado Common Cause v. Meyer,* at 159-60.

**B.**

▮▮▮ We next consider whether the district court correctly concluded that the proposed reclamation activities of Three Bells will constitute an appropriation of water. An appropriation is defined in section 37–92–103(3)(a), 15 C.R.S. (1987 Supp.), in pertinent part as follows:

"Appropriation" means the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law....

Since the water to be accumulated in the pits is underground water tributary to the Cache La Poudre River, it falls within the definition of "waters of the state," which includes all underground water tributary to natural streams, except designated ground water. § 37–92–103(13), 15 C.R.S. (1973). We must therefore determine whether the water in the pits will be applied to a beneficial use as part of the reclamation process.

▮▮▮ The Mined Land Reclamation Act declares that it is the intent of the General Assembly "to allow for the continued development of the mining industry of this state, while requiring those persons involved in mining operations to reclaim land affected by such operations so that the affected land may be put to a use beneficial to the people of this state." § 34–32–102. In furtherance of this policy, the legislature has required that anyone wishing to conduct mining operations must obtain a mining permit from the Mined Land Reclamation Board. §§ 34–32–109, –112, 14 C.R.

---

**10.** However, the position of the state engineer from 1969 through 1979 is not as clear as Three Bells suggests. Clarence J. Kuiper, the state engineer during this period, testified as follows at the hearing in this case:

I didn't feel that I had enough authority under the statutes at that time to administer sand and gravel pits on the evaporation from the ponds. I did feel that I had the authority if they were putting that water to a beneficial use and if they were actually appropriating the water which accumulated in the gravel pit, I felt I had authority to administer that, but not just for evaporation.

S. (1984). Each application for a mining permit must include a detailed reclamation plan. § 34–32–112(1)(b), (3). Three Bells submitted its reclamation plan as part of its application for a mining permit. The plan described an area of approximately 170 acres to be mined by the creation of pits in the alluvium of the Cache La Poudre River and provided that the pits would be allowed to fill with water and would remain on the property as lakes. According to the application, the lakes are to be used to create fishing areas and new and additional habitats for wildlife, and "will provide a new natural recreational resource for man."

"Beneficial use" is defined in section 37–92–103(4), which provides in pertinent part:

"Beneficial Use" is the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made and, without limiting the generality of the foregoing, includes the impoundment of water for recreational purposes, including fishery or wildlife.

Whether a use is beneficial is a question of fact and depends on the circumstances of each case. *City & County of Denver v. Sheriff*, 105 Colo. 193, 204, 96 P.2d 836, 842 (1939). In *State v. Southwestern Colorado Water Conservation District*, 671 P.2d 1294 at 1322, we held that land reclamation is a beneficial use. In the present case the reclamation plan required by the Mined Land Reclamation Act specifically provides that the ponds to be formed in the gravel pits will be used for recreation, including fishing areas and additional wildlife habitat. Such use of the ground water falls within the statutory definition of "beneficial use."

Three Bells argues, however, that an appropriation cannot be initiated without an intent to appropriate. Three Bells does not wish its activities to give rise to an appropriation and is willing to abandon any wa-

ter rights inadvertently created by its mining activities. Therefore, the argument proceeds, absence of the requisite intent is fatal to the claim that an appropriation will result from Three Bells' gravel mining operations. We are not persuaded by this argument.

 It is well-established that an intent to appropriate is necessary to initiate an appropriation. We have often held that a conditional water right requires a first step consisting of the formation of an intent to appropriate and a manifestation of that intent through physical acts. *See, e.g., City & County of Denver v. Colorado River Water Conservation Dist.*, 696 P.2d 730, 745–46 (Colo.1985); *City of Aspen v. Colorado River Water Conservation Dist.*, 696 P.2d 758, 761–64 (Colo.1985); *Elk–Rifle Water Co. v. Templeton*, 173 Colo. 438, 445, 484 P.2d 1211, 1214–15 (1971). As evidenced by its reclamation plan, Three Bells intends to excavate the pits and to reclaim the mined lands by the creation of ponds for recreation purposes, including fish culture and wildlife habitat. The legal consequence of these intended acts is an appropriation, and this result is not altered by the fact that Three Bells developed the reclamation plan only to satisfy statutory requirements and obtain a mining permit, and would not choose to engage in this course of action absent these requirements. The fact remains that, without regard to the source of its motivation, Three Bells does intend to fulfill the reclamation plan and therefore intends to effect an appropriation. *See Black v. Taylor*, 128 Colo. 449, 456, 264 P.2d 502, 506 (1953) (persons intend the reasonable, natural, and probable consequences of their acts).

Finally, in support of its argument that no appropriation has been initiated, Three Bells relies on testimony of its representatives that the future use of the pits is speculative and that it has made no plans for creation of recreational lakes or enhancement of wildlife habitat.[11] We con-

---

**11.** Three Bells also argues that since its reclamation plans may change, if presented to the water court as the basis for the adjudication of a water right, the application would be rejected as utter-

ly speculative, relying on *Colorado River Water Conservation Dist. v. Vidler Tunnel Water Co.*, 197 Colo. 413, 594 P.2d 566 (1979). However, the anti-speculation doctrine addresses the situa-

clude, however, that Three Bells cannot set forth a plan for reclamation in its application for a mining and reclamation permit and then later minimize the plan as a mere possibility or subject to change. Three Bells has agreed to reclaim the mined area for recreational purposes, including the provision of fishing areas and additional wildlife habitat. For the purpose of this proceeding we must accept that Three Bells intends faithfully to perform that undertaking.

## C.

We next consider whether the district court erred in determining that the gravel pits will be wells since they will obtain ground water for beneficial use from an aquifer. If the pits are "wells" as that term is used in the Ground Water Management Act, well permits are required pursuant to section 37–90–137, 15 C.R.S. (1973). "Well" is a defined term in the context of that act. § 37–90–103(21) supplies the following definition:

> "Well" means any structure or device used for the purpose or with the effect of obtaining ground water for beneficial use from an aquifer.

The broad language "any structure or device" includes any facility that obtains water from an aquifer. Although Three Bells is not digging the pits for the purpose of capturing ground water, and the water that accumulates hinders mining operations, the interception of ground water is the inevitable result of excavating pits to a depth below the water table. Thus, it is clear that the pits will be used with the effect of obtaining ground water from an aquifer. In order for the gravel pits to constitute wells, the water must be obtained for a "beneficial use." As explained in section III(B) of this opinion, the use of the water to maintain ponds for recreational purposes, including fish culture and wildlife habitat, is a beneficial use.

Therefore, Three Bells' gravel pits bear all the characteristics of a well as defined in section 37–90–103(21).

Three Bells argues, however, that when the provisions of the Ground Water Management Act are considered in broader context it becomes apparent that the term "well" was never intended to describe a sand and gravel pit. In support of this proposition, Three Bells points to requirements that an applicant for a well permit specify "the proposed maximum pumping rate," § 37–90–137(1), and that the well permit set forth any necessary "conditions for drilling, casing, and equipping wells." § 37–90–137(2). Three Bells argues that such requirements are clearly inapplicable to a gravel pit operator and suggests that the inclusion of such provisions reflects legislative intent to include only those facilities physically similar to the commonly understood concept of a well. We believe that the statutory definition of "well" itself belies this claim. The legislature employed the broadest of terms, "any structure or device," in describing the physical features of a well. Rather than focusing on the nature of the equipment used to obtain water, the legislature utilized a functional definition focusing on the activity it intended to regulate and control, thereby preventing ingenious water users from avoiding regulation by employing physical facilities that do not resemble the typical well. We believe that a literal application of the statutory language extends the requirements of the Ground Water Management Act to encompass the full range of possible facilities used for the purpose or with the effect of obtaining ground water for beneficial use from an aquifer, and that such result was intended by the legislature.

Three Bells next argues that although the pits may become wells at some time, they are not now wells. However, this same argument could be raised in relation to every proposal to construct a well. The

---

tion in which the purported appropriator does not intend to put water to use for its own benefit and has no contractual or agency relationship with one who does. It is intended to preclude the acquisition of a water right with a view to sale for profit rather than with the

purpose of application of water to beneficial use. The issue in the present case, in contrast, is the firmness of Three Bells' intent to take the action that will result in an appropriation. Therefore, *Vidler* is inapposite.

state engineer is required to evaluate a proposed well and to issue a permit prior to construction. The well permit process applies to those situations in which the planned construction or activity will result in the creation of a well. In this case, the proposed excavation below the water table will inevitably cause the pits to fill with water, and the implementation of the reclamation plan will result in beneficial use of that water. The well permit process allows these effects to be evaluated in advance of construction to determine whether they will work material injurious effect on senior water users.[12]

Requiring a well permit in advance of construction of a well allows the state engineer to evaluate "whether or not the exercise of the requested permit will materially injure the vested water rights of others." § 37–90–137(2). Unless the state engineer finds that "there is unappropriated water available for withdrawal by the proposed well and that the vested water rights of others will not be materially injured, and can be substantiated by hydrological and geological facts," § 37–90–137(2), a well permit shall not be issued. *See also Bohn v. Kuiper*, 195 Colo. 17, 575 P.2d 402 (1978). The assurance that no material injury will occur or that a plan for augmentation to alleviate that injury is in place is especially important with respect to the gravel pits at issue here, for once evaporation from lake surfaces begins there is no quick or inexpensive way to discontinue it.

### IV.

In summary, we conclude that declaratory judgment was appropriate in this case.

The reclamation of the mined property by the formation of lakes in the gravel pits will constitute an appropriation of water, and Three Bells' gravel pits will be wells, thereby requiring the quarry operators to obtain well permits in order to conduct the mining activities. Accordingly, the judgment of the district court is affirmed.

---

12. Three Bells also points to the provisions of section 37–90–137(3) that state that a permit to construct a well shall expire one year after issuance, subject to a one year maximum extension, unless the applicant furnishes to the state engineer evidence that water from the well has been put to beneficial use. Three Bells contends that these requirements cannot apply to a gravel pit because mining operations often extend over many years. For this reason, Three Bells asserts, it is clear that the legislature did not intend that the well permit provisions of section 37–90–137 be applied to sand and gravel mining operations. We agree that the statutory requirement may not seem to fit those mining operations extending over many years in which the beneficial reclamation use does not begin until mining is complete. We do not believe, however, that this incongruity demonstrates an intent to exempt from the well permit requirements of section 37–90–137 sand and gravel pits that obtain ground water for beneficial use from an aquifer. The state and division engineers have the expertise to develop policies for applying these provisions to long-term mining operations. We have no need in this case to determine precisely how section 37–90–137(3) will be applied to such operations.